NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-5285

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiff-Appellant*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, DEBRA HAALAND, in
her official capacity as Secretary of the Interior, MARTHA WILLIAMS, in
her official capacity as Director of the Fish and Wildlife Service
*Defendants-Appellees.*

_____

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-00791 (Hon. Timothy J. Kelly)

_____

**FEDERAL APPELLEES' PROOF BRIEF**

_____

|  |  |
|---|---|
|  | TODD KIM |
| Of Counsel: | *Assistant Attorney General* |
|  | KAMELA A. CASHETTE |
| Joan Marsan | KEVIN W. MCARDLE |
| *Attorney-Advisor* | CHRISTOPHER ANDERSON |
| Office of the Solicitor | *Attorneys* |
| U.S. Department of the Interior | Environment and Natural Resources Div. |
|  | U.S. Department of Justice |
|  | Post Office Box 7415 |
|  | Washington, D.C. 20044 |
|  | (202) 353-1834 |
|  | christopher.anderson@usdoj.gov |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellant Center for Biological Diversity.

**B.     Rulings Under Review**

References to the rulings at issue appear in the brief for appellant Center for Biological Diversity. The district court's opinion is now reported at 698 F. Supp. 3d 39 (D.D.C. 2023).

**C.     Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Christopher Anderson*
CHRISTOPHER ANDERSON

Counsel for Appellees

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases........................................ i

Table of Authorities ........................................................................................ iv

Glossary ......................................................................................................... vii

Introduction......................................................................................................1

Statement of Jurisdiction ................................................................................ 3

Statement of the Issues .................................................................................. 3

Pertinent Statutes and Regulations ............................................................... 4

Statement of the Case .................................................................................... 4

    A.    Statutory and regulatory background ....................................... 4

    B.    Factual background ...................................................................7

        1.    Species Background ..........................................................7

        2.    Regulatory History .........................................................10

            a.    Initial listing and 2008 status review .....................10

            b.    2015 Petition and subsequent reassessment .........................................................10

            c.    Service Assessment and Listing Determination ......................................................16

    C.    District court proceedings ........................................................19

Summary of Argument ................................................................................. 22

Standard of Review....................................................................................... 25

Argument ............................................................................ 26

I.      The Service reasonably found that the Beetle is not
        currently in danger of extinction but is likely to become
        endangered in the foreseeable future ................................ 26

        A.      The Listing Rule properly applies the ESA's
                definitions of "endangered species" and "threatened
                species" ...................................................................... 27

        B.      The Service reasonably determined that the Beetle is
                not presently in danger of extinction ........................ 31

        C.      The Service adequately explained why the Beetle is
                not presently in danger of extinction ........................ 37

II.     The 4(d) rule is not arbitrary ........................................... 43

Conclusion ........................................................................ 50

# TABLE OF AUTHORITIES*

## <u>Cases</u>

*Ali v. Regan,*
    111 F.4th 1264 (D.C. Cir. 2024).....................................................21

*Al-Tamimi v. Adelson,*
    916 F.3d 1 (D.C. Cir. 2019)..........................................20, 27, 43

*American Wildlands v. Kempthorne,*
    530 F.3d 991 (D.C. Cir. 2008) ..........................................25, 31

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,*
    515 U.S. 687 (1995) ..........................................................29, 30

*Center for Biological Diversity v. Everson,*
    435 F. Supp. 3d 69 (D.D.C. 2020) ........................................19

*Center for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018) ..............................................31

*Coosemans Specialties, Inc. v. Department of Agriculture,*
    482 F.3d 560 (D.C. Cir. 2007)..............................................39

*Department of Health & Human Services Family Support Administration v. Federal Labor Relations Authority,*
    920 F.2d 45 (D.C. Cir. 1990)................................................30

*Government of Manitoba v. Bernhardt,*
    923 F.3d 173 (D.C. Cir. 2019) ..............................................40

*Healthy Gulf v. Federal Energy Regulatory Commission,*
    107 F.4th 1033, 1047 (D.C. Cir. 2024)..................................42

*Investment Company Institute v. Commodity Futures Trading Commission,*
    720 F.3d 370 (D.C. Cir. 2013)..............................................38

---

* Authorities upon which we chiefly rely are marked with asterisks.

iv

*In re Polar Bear Endangered Species Act Listing
   & Section 4(d) Rule Litigation,
   709 F.3d 1, 8 (D.C. Cir. 2013) ...................................................25, 26, 31, 33

In re Polar Bear Endangered Species Act Listing
   & Section 4(d) Rule Litigation,
   794 F. Supp. 2d 65, 82–84 (D.D.C. 2011) ............................. 28, 39, 40, 41

Keating v. Federal Energy Regulatory Commission,
   569 F.3d 427, 433 (D.C. Cir. 2009) ..........................................................31

Loper Bright Enterprises v. Raimondo,
   144 S. Ct. 2244 (2024) ..................................................................... 21, 28

Marsh v. Oregon Natural Resources Council,
   490 U.S. 360 (1989)........................................................................... 25

Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.
   State Farm Mutual Automobile Insurance Co.,
   463 U.S. 29 (1983) ............................................................................ 38

Trout Unlimited v. Lohn,
   559 F.3d 946 (9th Cir. 2009).................................................................50

Union Pacific Rail Co. v. Surface Transportation Board,
   202 F.3d 337 (D.C. Cir. 2000)............................................................. 47

Ysleta Del Sur Pueblo v. Texas,
   596 U.S. 685 (2022)...........................................................................30

## Statutes

5 U.S.C. § 553................................................................................38

5 U.S.C. § 706 .............................................................................. 25

16 U.S.C. § 1531............................................................................ 4

16 U.S.C. § 1532(3).........................................................................49

16 U.S.C. § 1532(6) ................................................................... 5, 26, 27

16 U.S.C. §§ 1532(15) ...................................................................... 4

16 U.S.C. § 1532(19)....................................................................... 6

16 U.S.C. § 1532(20) ................................................................ 27, 29

16 U.S.C. § 1533 ............................................. 4–7, 10, 19, 43, 49

16 U.S.C. § 1538 ................................................... 6, 18, 43,

16 U.S.C. § 1539 ......................................................................... 18

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 3

## **Regulations**

50 C.F.R. § 17.11 ......................................................................... 4

50 C.F.R. § 17.31 ......................................................................... 7

50 C.F.R. § 402.01(b) ................................................................. 4

89 Fed. Reg. 23919 (Apr. 5, 2024) ........................................... 7

84 Fed. Reg. 19013 (May 6, 2019) .......................................... 17

## **Other Authorities**

89 Fed. Reg. 4966 (Jan. 25, 2024) ................................... 19, 37, 40

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Beetle | American Burying Beetle (*Nicrophorus americanus*) |
| CBD | Plaintiff-Appellant Center for Biological Diversity |
| ESA | Endangered Species Act |
| Service | U.S. Fish and Wildlife Service |
| SSA | Species Status Assessment Report for the American Burying Beetle (*Nicrophorus americanus*) (Feb. 2019) |

## INTRODUCTION

The Fish and Wildlife Service ("Service") first listed the American Burying Beetle ("Beetle") as an endangered species under the Endangered Species Act ("ESA") in 1989. Although the Beetle was once widespread, only two isolated Beetle populations were known at the time of listing. Since then, additional populations have been identified, and the Beetle is now known to inhabit parts of at least seven states.

Prompted by a petition from private parties, the Service began a reevaluation of the Beetle's classification in 2015. That review found that the Beetle's current status is stable, but that climate change poses a serious long-term threat. Using climate modeling, the Service predicted that rising temperatures will substantially reduce the Beetle's viability beginning around 2040 and that the Beetle will likely be extirpated from much of its current range in the 2040–2070 time period. Based on those findings, the Service determined that the Beetle is not presently in danger of extinction, and is thus not an "endangered species" as that term is defined in the ESA. Instead, the Service determined that the Beetle is a "threatened species" because it is likely that the Beetle will become endangered in the foreseeable future. The Service therefore issued a final rule reclassifying the Beetle as threatened under the ESA ("Listing Rule"). At the same time, the

Service issued a rule under section 4(d) of the ESA prescribing certain protections for the Beetle ("4(d) Rule").

The Center for Biological Diversity ("CBD") challenges the Service's reclassification decision, as well as the scope of protections the Service extended to the Beetle in the 4(d) Rule, under the ESA and the Administrative Procedure Act ("APA"). CBD argues that the Beetle must be "in danger of extinction" because the Service predicts that the Beetle will become extirpated throughout a significant portion of its range. But the Service predicts that it will be about 20 years before temperatures will rise sufficiently to threaten the Beetle's viability in a significant portion of its range, and that the near-term risk to the Beetle is low. As the Service explained, that time horizon allows ample time for the Service to monitor the Beetle's status and reclassify the Beetle as endangered if it becomes appropriate to do so. (Indeed, the Service announced in January 2024 that it was initiating a periodic review of the Beetle's status under the ESA.) The Service therefore acted reasonably in reclassifying the Beetle as threatened, and the Court should uphold that determination.

CBD's challenges to the 4(d) Rule also fail. CBD faults the Service for not prohibiting incidental take of the Beetle that results from soil-disturbing activities in the southern portion of the Beetle's range. The

Service explained, however, that such a prohibition would not be appropriate because habitat loss is not anticipated to be a significant threat to the Beetle in that region. CBD's objections to the Service's finding that habitat loss is not a threat are insubstantial, and the Service adequately explained the decisions it made in the 4(d) Rule. Accordingly, the Court should also uphold the 4(d) Rule.

The judgment of the district court should be affirmed.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1331. The district court entered a Final Judgment on all claims in favor of the Service on September 30, 2023. JA.____. CBD filed a timely notice of appeal on November 29, 2023. JA.____. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the Service reasonably concluded that the Beetle is threatened (rather than endangered) because the Beetle is not currently in danger of extinction but is likely to become endangered in the foreseeable future.

2.      Whether the Service acted arbitrarily by not prohibiting incidental take of the Beetle related to soil-disturbing activities in a portion

of the Beetle's range where the Service found that the potential for habitat loss is not a significant threat to the Beetle.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

Congress enacted the ESA, 16 U.S.C. § 1531 et seq., in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." *Id*. § 1531(b). The ESA tasks the Secretary[1] with determining which species should be listed as endangered or threatened. *Id*. § 1533(a)(1). An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range," while a threatened species is "likely to

---

[1] The ESA divides the responsibility for listing species between the Secretary of the Interior, who is generally responsible for terrestrial and inland fish species, and the Secretary of Commerce, who is generally responsible for marine and anadromous species. *See* 16 U.S.C. §§ 1532(15), 1533(a)(2). The Secretary of the Interior and the Secretary of Commerce have delegated their ESA responsibilities to the Fish and Wildlife Service and the National Marine Fisheries Service, respectively. *See* 50 C.F.R. § 402.01(b). The Fish and Wildlife Service has jurisdiction over the Beetle. *See id*. §§ 17.11, 402.01(b).

become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(6), (20).

A species may be listed as an endangered species or threatened species under the ESA in one of two ways: either on the initiative of the Secretary or as a result of a petition submitted by an "interested person." *Id*. § 1533(b)(3)(A). The ESA directs the Secretary to determine whether a species should be listed as an endangered species or threatened species based solely on five factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id*. § 1533(a)(1). The listing determination must be made "solely on the basis of the best scientific and commercial data available … after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation … to protect such species." *Id*. § 1533(b)(1)(A).

If the Secretary determines that listing a species is warranted, she implements the listing by publishing a final rule, following notice and comment, classifying the species. *Id*. § 1533(a). Following the listing of a

species, the Secretary develops and implements a recovery plan for the species. *Id.* § 1533(f).

After a species is listed as endangered or threatened, the Secretary reviews the species' status at least every five years. *Id.* § 1533(c)(2). If the Secretary determines—as a result of a five-year review or at any other time—that the status of a listed species has changed, she may reclassify the species. To do so, the Secretary engages in rulemaking and must base her determination on the five listing factors using the best scientific and commercial data available. *Id.* §§ 1533(c)(2).

Listed species are afforded certain legal protections. Pursuant to ESA Section 7, federal agencies must consult with the Service (or the National Marine Fisheries Service for species within its jurisdiction) to ensure the agency's actions are not likely to jeopardize a listed species' continued existence. ESA Section 9 prohibits "any person subject to the jurisdiction of the United States" from engaging in certain activities, including any illegal or unauthorized "take" of endangered fish or wildlife species.[2] *Id.* § 1538(a)(1). The ESA does not establish prohibitions for threatened species, but section 4(d)of the Act authorizes the Service to extend section 9

---

[2] The ESA broadly defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

prohibitions, or other protective measures, to any threatened species. *Id.* § 1533(d). The Service's regulations extend all section 9 prohibitions to threatened species, unless the Service has issued a species-specific rule under section 4(d). 50 C.F.R. § 17.31(a).[3]

## B. Factual background

### 1. Species Background

The American Burying Beetle is the largest carrion beetle in North America, reaching between 1 and 1.8 inches in length. FWS1335. As an annual species, the Beetle may live up to 12 to 16 months. FWS1336. Beetles are active from late spring through early fall and bury themselves to hibernate in the winter. FWS1338. They are adaptable to diverse habitats, including wet meadows, partially forested canyons, shrub land, grasslands, lightly grazed pastures, riparian zones, coniferous forests, and deciduous forests. FWS1343.

---

[3] At the time of the Listing Rule, the Service's regulations did not extend any section 9 prohibitions to species listed as threatened after September 26, 2019, unless the Service issued a species-specific rule. The Service amended that regulation on April 5, 2024. 89 Fed. Reg. 23919.



American Burying Beetle (*Nicrophorus americanus*)

During May and June, Beetles find a mate and a carcass (typically a small mammal or bird) for reproduction. FWS1340. Beetles bury the carcass and construct a brood chamber where the Beetles mate. The buried carcass provides food and moisture for both the adult Beetles and their young. Because of their size, Beetles require a larger carcass (80–200 grams) than other burying beetles to reach their maximum reproductive potential. FWS1347.

Historically, the Beetle's range included 35 states and the southern borders of three Canadian provinces. FWS1336. From the early 1900s to the 1970s, the Beetle lost 90 percent of its historical range. FWS1336; FWS1504. A similar decline has not been seen since, indicating that the causes of the decline are reduced or modified. FWS1504. The prevailing theory is that the Beetle's loss of range was caused by a reduction in the

amount of properly sized carrion (possibly due to the extinction of the passenger pigeon) and by increased competition for carrion. FWS1355.

In 1989, when the Service first listed the Beetle as endangered, there were only two known populations: one in Oklahoma and one on Block Island, Rhode Island. FWS1336. Following listing, survey efforts increased, and several additional populations were discovered. FWS1336. The Beetle is now known to inhabit portions of Arkansas, Kansas, Oklahoma, Nebraska, South Dakota, and Rhode Island.[4] In addition, reintroduced populations exist on Nantucket Island, Massachusetts, and in southwest Missouri. FWS1336–37. Efforts are ongoing to reintroduce the Beetle in Ohio, and there have been uncorroborated sightings of Beetles in Michigan. FWS1382.

Two factors limiting the Beetle's range are thought to be air temperature and moisture. Historically, the Beetles' range did not extend further south than Georgia and the Red River valley or further west than the Great Plains. FWS1374–75. Although the science is uncertain, it is

---

[4] The Beetle has also been found in Texas since listing, but no Beetles have been documented there since 2008. FWS1322.

thought that Beetles cannot thrive in areas where summer daytime mean-maximum temperatures exceed 95 degrees Fahrenheit.[5]

## 2.   Regulatory History

### a.   Initial listing and 2008 status review

The Service listed the Beetle as endangered in 1989 and completed a recovery plan for the species in 1991. FWS5889–FWS5900; FWS4943–FWS5023. In 2008, the Service issued a five-year review of the status of the Beetle, which recommended that the species remain listed as endangered. FWS5061.

### b.   2015 Petition and subsequent reassessment

On August 18, 2015, American Stewards of Liberty submitted a petition to delist the Beetle under the ESA. FWS1278–FWS1310. In response to that petition, the Service undertook a reevaluation of the status of the Beetle, which led to the actions under review. *See* 16 U.S.C. § 1533(b)(3)(A).

_____

[5] CBD incorrectly states that "high air temperatures ranging from 85 to 90 degrees Fahrenheit are known to 'kill or sterilize' captive beetle colonies." Br. 13.While there is some evidence of Beetle mortality at those temperatures, the exact thresholds for beetle survival are unknown. FWS1375–76. Moreover, because it is nocturnal, Beetles are not typically exposed to such temperatures, which only occur during the day throughout most of the Beetle's range. *See* FWS1415.

In February 2019, the Service finished a Species Status Assessment Report ("SSA") for the Beetle. FWS1321–FWS1504. The SSA is a peer-reviewed scientific document prepared by the Service that presents a comprehensive summary of the information on the Beetle and incorporates the best scientific and commercial data available. *See generally* U.S. Dep't of the Interior, Fish and Wildlife Service, *USFWS Species Status Assessment Framework* (Aug. 2016), available at https://www.fws.gov/sites/default/files/documents/species-status-assesment-framework-2016-08-10.pdf.

An SSA uses the conservation biology principles of resiliency, redundancy, and representation to evaluate the current and future viability of a species. *Id.* at 6; FWS1322. Resiliency refers to the ability of a species to withstand random, non-catastrophic threats to its survival (*e.g.*, warm or cold years). FWS180. Redundancy depends on the number and geographic distribution of resilient populations and concerns a species' ability to adapt to catastrophic events and long-term changes in the environment. FWS180; FWS1428. "Representation can be measured through the breadth of genetic diversity within and among populations and the ecological diversity … of populations across the species' range." FWS1428. The higher a species' resiliency, redundancy, and representation, "the more likely it is to sustain

populations over time, even under changing environmental conditions."
FWS180.

For purposes of analysis, the SSA grouped known Beetle populations
into three regions: the Northern Plains in Nebraska and South Dakota, the
Southern Plains in Texas, Oklahoma, Kansas, and Arkansas, and New
England, comprised of populations on Nantucket, Massachusetts, and
Block Island, Rhode Island. FWS1354. The Northern and Southern Plains
are each further divided into three "Analysis Areas": the Loess Canyons,
Sandhills, and Niobrara River Analysis Areas in the Northern Plains and
the Red River, Arkansas River, and Flint Hills Analysis Areas in the
Southern Plains. The New England region is considered a single Analysis
Area, resulting in seven total Analysis Areas.

The SSA first analyzed the current status of the Beetle, applying the
concepts of resiliency, redundancy, and representation to each Analysis
Area. The SSA found that the Beetle's resiliency is presently high or
moderate in six of the seven Analysis Areas, FWS1427, and found resiliency
to be low only in the southernmost Red River Analysis Area. FWS1423. As
for redundancy, the SSA found that the current number of Beetle
populations is as high as nine, including reintroduced populations, but is at
least five. FWS1430. Separation of those populations by considerable

distances and differences in habitat among the populations also support redundancy. FWS1430. Regarding representation, the SSA found that current genetic diversity is relatively high, but that ecological diversity is reduced because of the loss of most of the Beetle's historical range. Overall, the SSA found representation to be moderate. FWS1429.

Turning to the future, the SSA identified two primary threats to the



viability of the Beetle: habitat loss due to land-use changes and effects related to climate change. FWS1432–33. The SSA noted that other known risk factors (*e.g.*, the availability of appropriately sized carrion and soil

moisture) are dependent on or affected by habitat loss or climate change. FWS1323.

The SSA estimated the threat to the Beetle from habitat loss under two plausible future land-use scenarios.[6] The first scenario assumed that land-use change would continue at current rates with continued management of existing conservation lands. FWS1439. Under that scenario (without climate effects), the Service predicted no change in the Beetle's resiliency because of land-use changes. FWS1453. The second scenario assumed an accelerated rate of land-use change and no active management of conservation lands to benefit the Beetle. FWS1439. Under that scenario (again, without climate effects), resiliency was projected to be high or moderate for four Analysis Areas, including the Arkansas River and Flint Hills Analysis Areas in the Southern Plains, and low for the remaining three Analysis Areas. FWS1473.

The SSA then analyzed each land-use scenario under two climate-change scenarios, a moderate scenario in which temperatures stabilize

---

[6] CBD asserts that the SSA downplays threats from land-use changes, including threats posed by agriculture, citing comments by Dr. Douglas Leasure regarding a study on the risks to the Beetle from cropland conversion. Br. 14 n.1. But the Service agreed with Dr. Leasure that the study he refers to in the cited comments was unreliable, and the Service did not rely on it in the SSA. FWS1536–53 (listing references relied on in the SSA but omitting the study criticized by Dr. Leasure).

shortly after 2100 and a high scenario based on the upper end of projected future greenhouse gas emissions. FWS1325. Mean-maximum temperatures were modeled under each scenario for three 30-year time periods: early century (2010–2039), mid-century (2040–2069), and late century (2070–2099). FWS1483. The resulting forecasts represented a range of reasonable plausible future statuses for the Beetle in each Analysis Area. FWS1324.

To assess the future effects of climate change, the Service compared the predicted mean-maximum temperature for each time period to two thresholds: a 94- to 95-degree Fahrenheit threshold (for southern populations) at which the Beetle's resiliency is expected to be reduced, and a 95-degree threshold above which an area is expected to no longer support Beetle populations long-term. FWS1482.

Under either climate scenario, the SSA forecasted moderate or high resiliency for the Niobrara River and Sand Hills Analysis Areas and moderate to low resiliency for the New England Analysis Area through 2039. Resiliency for the remaining Analysis Areas was forecasted to be low by 2040, and the SSA predicted the extirpation of the Beetle from the Red River Analysis Area in that time period. FWS1326. The SSA predicted that those losses in resiliency would adversely affect representation and redundancy and reduce the future viability of the Beetle overall. FWS1326.

Under the high emission scenario, the long-term outlook for the Beetle is poor. If those forecasts prove correct, Beetle populations in the Southern Plains Analysis Areas would likely be extirpated by 2070, and it is possible that populations in the Northern Plains Analysis Areas could be extirpated by the end of this century. FWS1490, 1492. Only the New England populations would be expected to retain moderate resiliency through 2099 and only with active management. FWS1492. Under this scenario, viability of the species is projected to be low by the end of the century. FWS1326.

### c.    Service Assessment and Listing Determination

Based on the findings in the SSA, the Service determined that the beetle is not presently in danger of extinction. The Service noted that there are several more populations, distributed over a wider area, than were known at the time of listing. FWS169. And all but one of the known populations currently display high or moderate resiliency. FWS1427. In addition, the number of populations and their distribution show a good level of redundancy, and representation is moderate. FWS183. Evaluating those characteristics together, the Service concluded that "the American burying beetle's current viability is higher than was known at the time of listing" and that "the current risk of extinction is low for the American

burying beetle." FWS169, 187. Accordingly, the Service concluded that the Beetle is not currently in danger of extinction and is not endangered throughout all of its range. FWS190.

The Service also determined, however, that the Beetle is likely to become endangered in the foreseeable future. The Service identified climate change as the primary future threat to the Beetle's viability. FWS190. The Service noted that its projections suggest that the Beetle is likely to become extirpated from the Southern Plains Analysis Areas within the mid-century time period and that increased temperatures and land-use change will also reduce the Beetle's habitat in the Northern Plains. FWS183, 185–86. In addition, "the combined effects of land use and future climate changes are likely to impact the resiliency of most populations and the overall viability of the species." FWS190. Accordingly, the Service concluded that the Beetle is a threatened species throughout all of its range. FWS190–91.

The Service issued a proposed rule reclassifying the Beetle as a threatened species in May 2019. 84 Fed. Reg. 19013 (May 6, 2019); JA.____. Simultaneously, the Service proposed the 4(d) Rule to provide measures for the Beetle's conservation.

In the 4(d) Rule, the Service proposed to prohibit all intentional take of the Beetle as well as possession of unlawfully taken Beetles, import or

17

export of the species, shipping or delivering the species in interstate or

foreign commerce, and the sale or offering for sale of the species. FWS193.

Each of those activities is generally prohibited for endangered species. *See*

16 U.S.C. § 1538(a)(1). The Service also proposed to prohibit incidental

take[7] of the Beetle in certain circumstances depending on the geographic

area in which the incidental take occurs. In the Northern Plains and New

England Analysis Areas, the Rule prohibits incidental take related to soil-

disturbing activities in suitable Beetle habitat. FWS194. In the Southern

Plains Analysis Area, the Service proposed prohibiting incidental take only

within certain defined conservation lands, unless the take "occurs in

compliance with a Service-approved management plan … that includes

conservation measures for the American burying Beetle." FWS194.

 After notice and comment, the Service issued a final rule on October

15, 2020. FWS177–197. In the Final Rule, the Service made only two

changes from its initial proposal. First, the Service removed one area of

conservation lands in the Southern Plains from the 4(d) Rule's incidental

take prohibition. FWS177–78. Second, the Service evaluated whether the

Beetle is endangered in a significant portion of its range, which had not

---

[7] "Incidental take" is take that is incidental to, and not the purpose of, otherwise lawful activities. *See* 16 U.S.C. § 1539(a)(1)(B).

been required under the Service's approach to the analysis at the time of the proposed rule.[8] The Service determined that the Beetle is not endangered in any significant portion of its range, but is threatened throughout all of its range. FWS178.

On January 25, 2024, the Service published a notice that the Service is initiating a five-year review of the Beetle's status under the ESA. 89 Fed. Reg. 4966; *see also* 16 U.S.C. § 1533(c)(2). In that notice, the Service solicited the submission of any scientific or commercial information on the Beetle's status that has become available since the Listing Rule.

### C.    District court proceedings

CBD challenged the Listing Rule and 4(d) Rule in the District Court for the District of Columbia. CBD argued that the Service's determination that the Beetle is not presently in danger of extinction throughout a significant portion of its range is contrary to the language of the ESA and is arbitrary and capricious under the APA. CBD also argued that the Service violated the APA's notice-and-comment requirements by making its significant portion of the range analysis for the first time in the preamble to the final Listing Rule and by allegedly failing to disclose certain data on

---

[8] The Service's previous approach was held to violate the ESA in *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), decided after the Service published the proposed rule.

which it relied. CBD further asserted that the Service failed to adequately explain its change in position on the Beetle's status from the five-year review to the Listing Rule. Finally, CBD argued that the 4(d) Rule is arbitrary and capricious because it provides fewer protections for the Beetle in the Southern Plains than it does in other areas.

The district court ruled for the Service on all claims. The court first held that the Service provided adequate notice and opportunity to comment on the Listing Rule. Op 18–25. The district court also rejected CBD's argument that the Service failed to explain the change in its position on the Beetle's status.[9] Op. 41–49.

Turning to CBD's statutory arguments, the district court held that the Service's decision to reclassify the Beetle as threatened was consistent with the ESA. The court separately evaluated three aspects of CBD's statutory

---

[9] In its opening brief, CBD did not renew its arguments on the adequacy of the Service's notice-and-comment procedures or regarding the Service's explanation for its alleged change in position. It has therefore forfeited those arguments and may not raise them in its reply brief. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).

arguments under the *Chevron* framework.[10] It held at *Chevron* step one that the difference between an "endangered" and a "threatened" species depends solely on the different timeframes of the danger of extinction, and whether the danger "is present or likely to occur later." Op. 29–33. The court then considered whether the Service permissibly interpreted the phrase "in danger of extinction" in the definition of "endangered" to mean that "there is a high probability of total disappearance in a short time" and held that the Service's view was reasonable under *Chevron* step two, Op. 34–35. Finally, the court held, again at *Chevron* step two, that the Service reasonably determined that the mid-century time period (2040–2069) fell within the "foreseeable future" rather than the present. Op. 37.

The district court next determined that the reclassification of the Beetle from endangered to threatened was adequately supported by the administrative record. Op. 39–40. In particular, the court noted that CBD failed to identify any information that the Service did not consider and that

_____

[10] The Supreme Court overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), so this aspect of the district court's judgment cannot be affirmed on the district court's reasoning. As explained below, the district court's judgment remains correct under the approach to statutory interpretation announced in *Loper Bright* and may be affirmed on that ground. *Ali v. Regan*, 111 F.4th 1264, 1277 (D.C. Cir. 2024).

the Service adequately explained why present threats to the Beetle do not put the species in danger of extinction. Op. 39.

Finally, the district court upheld the 4(d) rule. The court found that the record supported the Service's determination that a prohibition on incidental take resulting from soil-disturbing activities was not required for Beetle populations in the Southern Plains. Op. 51–52. The court also held that the Service adequately explained its rationale for the 4(d) Rule. Op. 54 –57.

## SUMMARY OF ARGUMENT

1. The Listing Rule is consistent with the plain language of the ESA, well-supported by the administrative record, and should be upheld. The Service correctly interpreted the ESA and concluded that the only difference between an endangered and a threatened species is the timing of the endangerment. CBD does not challenge that interpretation but argues that the Beetle must now be in danger of extinction because the Service has predicted that the species will become extirpated from the Southern Plains in the 2040–2069 time period. But the text of the ESA does not define the boundary between the present and the foreseeable future. Rather, Congress entrusted the Service with the task of determining, based on the best available science, whether the threats to a species' viability put the species

in present danger of extinction or are only likely to do so in the foreseeable future. That determination requires applying the Service's expertise to the facts of the species' situation and is therefore reviewed under the arbitrary and capricious standard.

The Listing Rule easily passes muster under that test. The Service found that there are currently several resilient Beetle populations, that all those populations save one are not currently threatened by climate change or habitat loss, and that the risk of the Beetle's extinction in the near-term is low. The Service therefore reasonably concluded that the Beetle is not "in danger of extinction." The Service also found, however, that the Beetle's fortunes are likely to change in the coming decades and that temperature increases due to climate change may threaten the Beetle's viability in the Southern Plains from about 2040 onwards. Accordingly, the Service concluded the Beetle is likely to become endangered within the foreseeable future and is therefore a threatened species. Those conclusions are well-supported and are not arbitrary and capricious.

Finally, the Service adequately explained the basis for the listing rule. CBD criticizes the Service for not laying down some standard for determining whether a threat presently puts a species in danger of extinction or will only do so in the foreseeable future. The Service was not

23

required to articulate such a standard, however, and the diverse array of species and threats to those species would make it difficult, if not impossible, to formulate a generally applicable test. Instead, the Service appropriately makes listing decisions case-by-case. As the Service explained, the Beetle is not endangered because the Beetle's current status is stable, and the present risk of extinction is low. But if climate change proceeds as predicted the Beetle is likely to become in danger of extinction in about 20 years and is therefore threatened. No more was required.

2. The Service provided a sound rationale for the 4(d) Rule. The ESA authorizes the Service to issue regulations "necessary and advisable" to provide for the conservation of the species. The Service did not prohibit incidental take associated with soil-disturbing activities in the Southern Plains because, as the Service explained, habitat loss is not a significant threat to the Beetle's viability in that area. Nor does the 4(d) Rule conflict with the ESA's conservation mandate because a prohibition on incidental take associated with soil-disturbing activities in the Southern Plains would not further the Beetle's recovery. The 4(d) Rule should therefore be upheld.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 8 (D.C. Cir. 2013) ("*Polar Bear IV*").

The Court will uphold the Service's listing decisions unless they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)). Under that standard, the Court "presumes" that the Service's classification decisions are "valid." *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008) (quotation omitted). Review under the arbitrary and capricious standard is limited to determining whether the Service "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Polar Bear IV*, 709 F.3d at 8 (quotation omitted). Listing determinations "require[] a high level of technical expertise" and a reviewing "court is not to substitute its judgment for that of the agency." *Id.* at 3 (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)).

## ARGUMENT

## I.   The Service reasonably found that the Beetle is not currently in danger of extinction but is likely to become endangered in the foreseeable future

CBD does not seriously dispute the Service's findings regarding the Beetle's current status and likely future. Instead, CBD argues that those findings compel the conclusion that the Beetle is endangered. But the Service's conclusion that the Beetle is properly classified as threatened is consistent with the plain text of the ESA and well-supported by the administrative record, and the Service clearly explained the reasoning for its decision. At the end of the day, CBD's arguments "amount to nothing more than competing views about policy and science," which are insufficient to show that the Listing Rule is arbitrary and capricious. *Polar Bear IV*, 709 F.3d at 3.

Although it does not expressly say so, it appears that CBD's challenge is limited to the Service's determinations about the status of the Beetle in the Southern Plains Analysis Areas, and CBD essentially argues that the Service should have found that the Beetle is endangered in those Analysis Areas (which CBD says constitute a significant portion of the Beetle's range). Br. 24; *see* 16 U.S.C. § 1532(6). CBD's arguments are all specific to the Service's findings regarding the status of the Beetle in the Southern

26

Plains, and CBD does not appear to challenge the Service's conclusions that the Beetle is not currently in danger of extinction in the Northern Plains or New England Analysis Areas. CBD has therefore forfeited any argument that the classification of the Beetle as threatened is arbitrary because of the Beetle's status in those areas, *Al-Tamimi*, 916 F.3d at 6, and this brief will focus on the Service's findings regarding the Southern Plains.

### A.    The Listing Rule properly applies the ESA's definitions of "endangered species" and "threatened species"

The ESA distinguishes between endangered and threatened species solely based on the timeframe of the risk to the species. FWS187. An "endangered species" is one that "*is* in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6) (emphasis supplied), and a "threatened species" is one that "is likely to *become* an endangered species [*i.e.*, to become in danger of extinction] within the foreseeable future throughout all or a significant portion of its range," *id*. § 1532(20) (emphasis supplied). As the district court held, "the only textual difference between the ESA's definitions of endangered and threatened species is time." Op. 29.

In accordance with the plain statutory language, the Service has consistently interpreted the ESA to mean that a species must be *presently*

at risk of extinction to be listed as endangered, *see In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 82–84 (D.D.C. 2011) ("*Polar Bear II*") (describing the Service's interpretation of "in danger of extinction"), whereas a threatened species is one that is likely to become endangered *only* in the future, FWS187. The Service evaluates whether a species is presently in danger of extinction by examining the species' characteristics and current circumstances, including the cumulative effect of all threats on the species as a whole. FWS179. For a species to be endangered, its extinction need not be certain or inevitable, and the Service may classify a species as endangered even if the likelihood of its extinction cannot be estimated. *See Polar Bear II*, 794 F. Supp. 2d at 83 (describing the Service's application of the "in danger of extinction" standard). What matters is whether the species' *current* circumstances are such that they put the species at *present* risk of extinction. *See* FWS187.

CBD does not dispute that this is the "best reading" of the ESA. *Loper Bright*, 144 S. Ct. at 2247. Instead, CBD argues that the Beetle must be "in danger of extinction" in the Southern Plains now because the Beetle is losing habitat there due to rising temperatures and the Service expects the Beetle to be extirpated from the area in the future. Br. 27. CBD's argument fails because whether a species is currently in danger of extinction or likely

to become endangered only in the future is not a question of statutory interpretation, and the classification of a species cannot be determined simply by parsing the words "in danger." The ESA does not define what it means for a species to be "in danger" (and, tellingly, CBD never offers its own definition).[11] Instead, as courts have recognized, determining whether a species is "in danger of extinction" requires an exercise of scientific judgment based on the characteristics of the species and the nature of the threats. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 708 (1995) ("The task of defining and listing endangered and threatened species requires an expertise and attention to detail that exceeds the normal province of Congress.").

The question whether known threats put a species in current danger of extinction or will do so only in the future is no different. The text of the ESA, standing alone, cannot answer the question whether the threats facing a species put that species presently "in danger of extinction" or will only do so in the future. If it is "likely" that a species will be in danger of extinction in the "foreseeable future," 16 U.S.C. § 1532(20), then there is at least some risk now that the species will later become extinct. But if that were enough

---

[11] CBD's citation of cases instructing courts to apply statutory definitions as written is therefore beside the point. Br. 27.

to put a species "in danger of" extinction, then the categories of "endangered" and "threatened" would collapse into one another. *Cf. Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (rejecting an interpretation because it would "violate[] our usual rule against ascribing to one word a meaning so broad that it assumes the same meaning as another statutory term"). Instead, determining whether a species is presently in danger of extinction or will only become so in the future requires a factual and scientific examination of all the relevant circumstances. And Congress entrusted to the Service the task of making that evaluation based on the best scientific and commercial data available. *See Sweet Home Chapter*, 515 U.S. at 708.

Thus, CBD's "plain language" argument is not really about the correct interpretation of the ESA, which all parties agree distinguishes between endangered and threatened species based solely on the timing of the endangerment. Rather, CBD challenges the reasonableness of the line that the Service drew in this case between the present and the foreseeable future. Such questions of line drawing are reviewed under the arbitrary and capricious standard. *Dep't of Health & Hum. Servs. Fam. Support Admin. v. Fed. Lab. Rels. Auth.*, 920 F.2d 45, 48 (D.C. Cir. 1990) (reviewing an agency's reasonable "drawing of the lines" when the relevant statutory term

was not "susceptible to precise measurement"); *see also Keating v. Fed. Energy Regul. Comm'n*, 569 F.3d 427, 433 (D.C. Cir. 2009) (similar). And the Service's "judgements about policy and science" that inform that line-drawing are entitled to deference from the courts. *Polar Bear IV*, 709 F.3d at 9; *Am. Wildlands*, 530 F.3d at 1000; *accord Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018).

### B.  The Service reasonably determined that the Beetle is not presently in danger of extinction

The Service reasonably concluded that the Beetle faces a "relatively low near-term risk of extinction" but that it is likely to become in danger of extinction in the foreseeable future and thus falls squarely within the ESA's definition of a "threatened species." FWS190.

Applying the concepts of resiliency, redundancy, and representation, the SSA found that six of the seven Analysis Areas show high or moderate resiliency. FWS1427. Those Areas, including the Arkansas River and Flint Hills Analysis Areas in the Southern Plains, provide millions of acres of suitable habitat, several large protected areas, and a relatively wide distribution of Beetles. FWS182; FWS1423–24, 1427. Representation is considered moderate, with current populations showing relatively high genetic diversity. FWS182. And multiple populations spread over large areas provide redundancy, thereby reducing the risk of catastrophic events.

FWS182. The Service further determined that neither land-use change nor climate change is presently causing a significant impact on the Beetle's viability. FWS190. While land-use change can harm the Beetle by reducing the amount of suitable habitat, the large areas of suitable Beetle habitat in the Southern Plains "buffer the effects of most land use changes." FWS183.

The most significant threat to the Beetle is climate change, but its effects are currently limited. The Beetle is presently experiencing adverse impacts from climate change only in the Southern Plains Analysis Areas, FWS192, and within those areas, only the Red River Analysis Area is now experiencing temperatures at or near the threshold for unsuitability, *see* FWS185. Overall, the Service found that the current "magnitude" of climate change effects in the Southern Plains is "low enough that the species is not in danger of extinction." FWS192. Only in the future—and in most cases at least 20 years in the future—are temperatures expected to rise in the Southern Plains to a level that would threaten the Beetle's viability. FWS185, 192. The Service also found that it is possible, albeit unlikely, that the Beetle will be able to adapt to higher temperatures. FWS1490.

Taking those findings together, the Service reasonably concluded that the status of the Beetle is "currently relatively stable," FWS187, and that the

Beetle "is not currently in danger of extinction" throughout all of its range. FWS190.

CBD does not challenge any of the Service's specific findings as not supported by the record. *See* Op. 39 ("Far from explaining why the Service's factual analysis fails … Plaintiff seems to agree with it."). Nor, as the district court found, does CBD identify any additional information that the Service failed to consider. *Id*. Instead, CBD "merely disagree[s] with the implications of the data for the species' continued viability." *Polar Bear IV*, 709 F.3d at 9. But disagreement with an agency's scientific and policy judgments does not show that those judgments are arbitrary and capricious. *Id*.

Worse, CBD's arguments "rely on portions of the record taken out of context" or "blatantly ignore" the Service's explanations and contrary findings. *Id*. For example, CBD is incorrect when it says that the Service "found" that the Beetle "is currently experiencing an extinction event in the Southern Plains." Br. 23. To the contrary, the Service found that Beetle populations currently exhibit "good" resiliency throughout most of the Southern Plains. FWS1423−24. Nor did the Service find that climate change is "already causing a drastic reduction" in the Beetle's habitat in this

region.[12] Br. 23. Instead, the Service found that climate change is presently curtailing the Beetle's range only in the southernmost Red River Analysis Area, the smallest of the three Southern Plains Analysis Areas. FWS1484. In fact, the Service found that the Beetle's abundance is fair and its distribution is good in the Arkansas River Analysis Area, just to the north of the Red River Analysis Area, which supports the Service's conclusion that the effects of climate change are limited for now. FWS1423.

CBD also misinterprets the Service's projections of when climate change may be expected to threaten the Beetle's viability. To assess the likely effects of climate change, the Service modeled future summertime mean-maximum temperatures for each Analysis Area over three separate 30-year time periods. FWS1483, 1488. Those modeling results represent 30-year averages and cannot be used to estimate temperatures in any given

---

[12] CBD also incorrectly states that the Service has concluded that the Beetle has been extirpated from Texas and the Arkansas portions of the Red River Analysis Area. Br. 25. Although there have been no positive Beetle identifications in Texas since 2008, the Service found only that Beetles "may be extirpated" in Texas and did not reach any firm conclusion. FWS1423. While there have been no positive Beetle surveys in the Arkansas portion of the Red River Analysis Area since 2012, survey efforts in that area have been limited, and the Service has reached no conclusions about the status of the Beetle there. *See* FWS1404–05. The Beetle is still present in Arkansas in the Arkansas River Analysis Area and has been monitored annually at Fort Chaffee. FWS1406–08.

year. FWS1482. In addition, those modeling results varied across geography, with temperatures rising at different rates in different places.

The Service then compared modeled temperatures against two thresholds: (1) a "near mean maximum threshold" of 94 to 95 degrees for Southern Beetle populations and (2) a greater than 95-degree threshold. FWS1482. The near mean maximum threshold represents climate conditions that would adversely affect the Beetle's resiliency, but at which the Beetle would remain viable. FWS1482. Once mean-maximum temperatures in an area exceed 95 degrees, the Service expects that the area would no longer provide suitable habitat for the Beetle and that the Beetle would become extirpated from that area. FWS1482. Extirpation would not be immediate, however. Beetles may survive periodic years with mean maximum temperatures at or above 95 degrees. FWS1482. It is only when mean-maximum temperatures exceed that threshold on a consistent basis that the Service would expect the Beetle to become extirpated.

CBD thus overstates the case when it says that the Beetle is at risk of being extirpated from the Southern Plains Analysis Areas "only 15 years from now." Br. 24. Putting aside that the Service was looking 20 (not 15) years in the future when it made its reclassification decision in 2020, the Service never predicted that the Beetle could be extirpated from the

35

Arkansas River or Flint Hills Analysis Areas by 2039.[13] What the SSA describes for those Analysis Areas is a 20- to 50-year trajectory in which the Beetle's resiliency throughout most of the Southern Plains declines from "good" (as of 2019) to "low" by 2040 and the Beetle eventually becomes extirpated from those areas by 2070. FWS192; FWS1488–89.

If those projections prove accurate (which is uncertain), and if the Beetle is not otherwise able to adapt to higher temperatures, then it may be that the Beetle will become "in danger of extinction" in the Southern Plains by 2040. FWS187. But the Service found that climate change is not currently causing significant impacts to the Beetle's viability in the Southern Plains overall. FWS192. That is the very definition of a "threatened" species—a species that is not currently in danger of extinction but is likely to become so in the foreseeable future.

In addition, the Service acknowledged that "a threatened species determination implies a potential need to reclassify the species as endangered if … projections about its status in the foreseeable future are

---

[13] By contrast, the Service found that temperatures in the Red River Analysis Area are already at or near threshold temperatures, and that climate change is expected "to make all habitats in this analysis area unsuitable by 2039." FWS1487–88. The Red River Analysis Area includes only about 14 percent of the suitable Beetle habitat in the Southern Plains, and CBD does not argue that the Red River Analysis Area alone represents a significant portion of the Beetle's range.

accurate." Twenty years is more than sufficient time for the Service to monitor the Beetle's situation and to reclassify the Beetle as endangered if temperatures rise to a level at which such classification would be warranted. Indeed, the Service is currently undertaking a five-year review of the Beetle's status, which will allow it to reassess the Beetle's situation in light of the most recent data and climate forecasts. *See* 89 Fed. Reg. 4966, 4967 (Jan. 25, 2024). The Service's conclusion that the Beetle is threatened, but not endangered, throughout all of its range is consistent with the definition of those terms in the ESA, is well-supported by the Service's factual findings, and should be upheld.

### C.    The Service adequately explained why the Beetle is not presently in danger of extinction

CBD's final line of attack is to argue that even if the reclassification decision is otherwise supportable, it must still be set aside because the Service has not adequately explained why the Beetle is threatened rather than endangered. More specifically, CBD argues that the Service "has provided no indication as to where it draws the line" between species that are "in danger of extinction" and those that will only become so "in the foreseeable future." Br. 39.

CBD is wrong. As explained above, pp. 31–33, the Service more than adequately explained that the Beetle is not presently in danger of extinction

because there are multiple populations with high or moderate resiliency despite current threats. FWS190. The Service also explained that it is reasonably likely that the Beetle will become endangered in the foreseeable future because the effects of climate change are expected to sharply reduce the Beetle's resiliency in most of the Southern Plains from around 2040. FWS191–92. That explanation is supported by the specific findings in the SSA, and it more than adequately meets the requirements of the APA. 5 U.S.C. § 553(c); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency's explanation is sufficient if it draws a "rational connection between the facts found and the choice made"); *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 376–77 (D.C. Cir. 2013) ("So long as … the reviewing court can reasonably discern the agency's path, we must uphold the regulation." (quotation and alterations omitted)).

The Service was also not required to set out in advance some generally applicable standard for determining when threats to a species are sufficiently distant in time that they do not presently put the species in danger of extinction. Agencies routinely apply statutory language on a case-by-case basis, and that "is especially true if the term may be better fleshed out through application of the law to specific cases and their facts."

38

*Coosemans Specialties, Inc. v. Dep't of Agric.*, 482 F.3d 560, 564 (D.C. Cir. 2007). Indeed, attempting to articulate a standard applicable to all species in all situations would be extremely difficult and possibly infeasible. As the Service explained, what constitutes the "foreseeable future" is necessarily context dependent, and must account for considerations "such as the species' life-history characteristics, threat-projection timeframes, and environmental variability." FWS180. The Service applied those factors in this case and reasonably determined that climate change is not presently threatening the Beetle's viability but is likely to do so in the foreseeable future. No more was required.

CBD argues that the line the Service drew in this case differs from the line drawn in the listing of the polar bear, Br. 32–33, but the situations are quite similar. Both species face serious long-term threats because of climate change, yet both species are currently stable. FWS187 (Beetle); *Polar Bear II*, 794 F. Supp. 2d at 76–77. CBD tries to distinguish the two by saying that the Beetle has already suffered "severe restrictions in its range in the Southern Plains," Br. 33 (quotation omitted), but that is not correct. Outside the Red River Analysis Area, the Service found that the magnitude of effects from climate change in the Southern Plains is low. FWS192. Like the polar bear, however, the Beetle's situation is likely to decline in the

foreseeable future due to increases in atmospheric temperatures. FWS192; *Polar Bear II,* 794 F. Supp. 2d at 76. The fact that the two species are projected to experience negative effects from climate change on different schedules, *Polar Bear II*, 794 F. Supp. 2d at 76 (noting that the Service expected climate change to affect polar bears within 45 years), and that the Beetle may begin to experience significant effects sooner, does not change the basic point that those impacts will only threaten the species' viability in the future. And the impacts are far enough in the future that it is reasonable for the agency to monitor the Beetle's status for now and to take future action as warranted. *See* 89 Fed. Reg. at 4967 (announcing earlier this year that the Service would undertake a five-year review of the Beetle's status).

To the extent CBD is arguing that the Service's classification of the Beetle is arbitrary because it departs from the approach to species classification that it articulated in conjunction with listing the polar bear, *see* Br. 33 & n.5, CBD has forfeited that argument by not adequately developing it. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (quotation omitted)). In any case, the Service's classification of the Beetle is consistent with its approach

to classification of the polar bear. *See Polar Bear II*, 794 F. Supp. 2d at 82–83 (describing the Service's approach, including the identification of four categories of past "endangered" listings).

Contrary to CBD's perfunctory assertions, the Beetle fits into none of the four categories of cases in which the Service has generally found species to be in danger of extinction. First, the Beetle's extirpation from the Southern Plains is neither imminent nor certain (category 1) as the Service does not expect the Beetle to be extirpated for 20 years or more and there is some uncertainty about Service's climate change forecasts and the Beetle's ability to adapt to higher temperatures. FWS1488–90. Second, the Beetle is not a narrowly restricted endemic (category 2), but is distributed across at least seven geographically diverse populations, all but one of which display high or moderate resiliency, and there are opportunities for reintroducing the Beetle in areas where climate risk is lower. FWS1427, 1502–03. Third, the Beetle has not been reduced to critically low numbers (category 3); rather the Beetle's population currently appears to be stable throughout most of its range. FWS1404–11. Finally, although the Beetle has suffered a major reduction in its historical range (category 4), the factors causing those historical reductions appear to have abated, and the Beetle's status has remained relatively stable since the 1980s. FWS1504.

\*   \*   \*   \*   \*

The Service thoroughly examined the Beetle's current circumstances and evaluated future threats. Based on that evaluation and its expert judgment, the Service concluded that the Beetle is not in danger of extinction at present, but that its situation is likely to worsen in the future to a point at which it will be. Those findings and conclusions were well-supported by the record and are entitled to deference. The Service's ultimate conclusion that the Beetle meets the ESA's definition of threatened is consistent with the plain meaning of the statute and should be upheld.

If the Court nonetheless finds that the Service's explanation for its listing decision is deficient in some respect, the Court should remand the final rule to the Service without vacatur. *See Healthy Gulf v. Fed. Energy Regul. Comm'n*, 107 F.4th 1033, 1047 (D.C. Cir. 2024) ("The decision to vacate depends on two factors: the likelihood that deficiencies in an order can be redressed on remand … and the disruptive consequences of vacatur."). CBD has not disputed any of the Service's findings about the Beetle's current status or the likely future effects of climate change. It is therefore likely that the Service will be able to correct any deficiencies in its explanation for its listing decision on remand. Further, vacatur of the listing decision would be highly disruptive because it would reinstate the

42

Beetle's previous listing as endangered, thereby triggering the full suite of ESA prohibitions applicable to endangered species while the Service reconsiders the Beetle's classification. *See* 16 U.S.C. § 1538. Doing so would impose significant costs on both private parties and the Service that may prove unnecessary should the Service reaffirm the Beetle's classification as threatened. Nor has CBD made any argument that immediate imposition of those prohibitions is necessary or would materially improve the likelihood of the Beetle's survival.

## II.    The 4(d) rule is not arbitrary

Having found the Beetle to be threatened throughout all of its range, the Service promulgated a rule prescribing measures for the Beetle's conservation, as authorized by section 4(d) of the ESA. 16 U.S.C. § 1533(d). CBD faults the Service for not prohibiting incidental take of the Beetle caused by soil-disturbing activities in suitable Beetle habitat in the Southern Plains.[14] As the Service explained, however, there is no need to prohibit soil-disturbing activities in the Southern Plains because those activities "are not considered a threat" to Beetle populations in those Analysis Areas. FWS195. That determination is well-supported by the

---

[14] CBD did not raise any other challenges to the 4(d) rule in its opening brief and has therefore forfeited any such challenges. *Al-Tamimi*, 916 F.3d at 6.

43

findings in the SSA. CBD's contrary arguments either rely on outdated information from the 2008 five-year review or misstate the Service's more recent findings in the SSA.

The Service explained that it was not generally prohibiting incidental take from soil-disturbing activities in the Southern Plains because "[l]and use changes … that cause habitat loss and fragmentation are a minor risk in Southern Plains analysis areas" and "are not considered a threat to the species in this area." FWS195. The Service found that the Southern Plains contain large areas of suitable Beetle habitat and relatively large areas of protected habitat, and that land-use changes are projected to result in the loss of less than two percent of the suitable habitat in the Southern Plains. FWS195.

The Service nonetheless determined that incidental take should be prohibited in defined conservation areas in the Southern Plains because those conservation lands "provide relatively large protected areas of habitat with good populations" and "would potentially serve as sources of [Beetles] for relocation and reintroduction efforts" in areas with lower climate-change risks. FWS194. The Service explained that it was appropriate to prohibit incidental take in the specified conservation lands, despite some protections for the Beetle on those lands, because those areas are not being

intentionally managed to benefit the Beetle and "monitoring and management would likely cease at some sites without the incidental take protections in place specific to the species." FWS195.

CBD lobs multiple attacks on the Rule's rationale, but all of its arguments miss the mark.

1. CBD argues that it was arbitrary for the Service to prohibit incidental take related to soil-disturbing activities in the Northern Plains but not the Southern Plains because such activities are "major threats" to the Beetle in both areas. CBD is wrong for two reasons. First, the Service found that the habitat loss and fragmentation "are not considered a threat" to the Beetle in the Southern Plains. FWS195. CBD cites statements in the five-year review and SSA that identified habitat loss and alteration as "risk factors," Br. 37–38, but overlooks the SSA's evaluation of those factors and its conclusion that "[T]here are no changes ... anticipated in resiliency" for Southern Plains Beetle populations due to habitat loss under either of the Service's projected land-use scenarios. FWS1471. The Service reached that conclusion because there are large areas of habitat in the Southern Plains that "tend to buffer the effects of most land use changes." FWS1471. Further, any habitat loss is expected to be small relative to the area of available habitat. The Service projected a "combined permanent loss"

through the end of the century of 1.2 percent or 246,293 acres from the existing 19,995,088 acres of suitable habitat in the Southern Plains Analysis Areas. FWS1471.

CBD is also wrong that the situation in the Southern Plains is like the situation in the Northern Plains. The Southern Plains populations are contiguous, and those Analysis Areas contain large areas of protected habitat that support good Beetle populations, FWS191, whereas "[o]nly low percentages of the Northern Plains Analysis Areas are protected, with only one large protected area that supports significant numbers of [Beetles]," FWS194. The Northern Plains contains less suitable habitat (13,282,102 acres of suitable habitat verses 19,995,088 acres in the Southern Plains), and the Loess Canyons population is relatively small and isolated from the Sandhills and Niobrara River populations. FWS182. The Service also projects that land-use changes will affect a larger percentage (5 to 15 percent) of Northern Plains habitat. FWS194. Finally, the Service anticipates that up to 30 percent of Beetle habitat may be lost in the Loess Canyon Analysis Area in the Northern Plains due to expansion of invasive red cedar forests, which is less of a concern in the Southern Plains. FWS165, 183. Given those differences, it was reasonable for the Service to

46

prohibit incidental take related to soil-disturbing activities in the Northern Plains, but not in the Southern Plains.

2. The Service adequately explained why an expected loss of less than two percent of suitable Beetle habitat in the Southern Plains supports its determination that a general prohibition on incidental take from soil-disturbing activities is unnecessary. The Service found that there are nearly 20 million acres of suitable Beetle habitat in the Southern Plains, FWS183, and that there are large areas of protected habitat, FWS189. Two percent is a small percentage, and given the size of the denominator, it was implicit in the Service's explanation that the remaining available habitat would be more than adequate to support the Beetle's conservation. *See Union Pac. R. Co. v. Surface Transp. Bd.*, 202 F.3d 337, 343 (D.C. Cir. 2000) (upholding an agency decision when the explanation for its action was "implicit in [its] admittedly terse rationale"); *see also* Op. 57 ("[I]t is self-evident that 1.2 percent is a small figure.").

3. Nor was it arbitrary for the Service not to prohibit incidental take related to oil and gas activities in the Southern Plains Analysis Areas. Despite CBD's claim to the contrary, Br. 41, habitat alteration due to oil and gas activities is included in the less than two percent of habitat loss the Service expects because of land-use change. FWS189 ("[O]ur analysis ...

47

indicated that less than 2 percent of suitable habitat in the Southern Plains analysis area is vulnerable to the effects of all impacts combined (including oil and gas activities)."). If the Service determined that a projected loss of two percent of suitable habitat is not a significant threat to the Beetle, then *a fortiori* a fraction of that loss is not a substantial threat. And indeed, the anticipated loss of habitat from soil and gas activities is projected to be minimal. Based on past rates of oil and gas disturbance, the Service projected that only 3,550 acres of permanent habitat loss due to oil and gas activities over 30 years, which again is out of nearly 20 million acres of suitable Beetle habitat. FWS1356. Such losses, amounting to a little over one-tenth of a percent of available habitat, are minimal, and there was no need to include them within the 4(d) Rule's incidental take prohibitions. CBD relies on the five-year review's identification of oil and gas activity as a potential threat to the Beetle, but ignores the Service's more recent quantitative analysis in the SSA of the likely impacts of oil and gas development. Br. 41.

4. Bafflingly, CBD argues that it was arbitrary for the Service to prohibit incidental take on conservation lands because "[t]here is no evidence in the record that preexisting 'conservation lands' required further safeguards." Br. 40. But, as the Service explained, those safeguards could be

lost without ongoing ESA protections. FWS195. Thus, the prohibition on incidental take on conservation lands is directed at maintaining those protections, not expanding them. And even if CBD were right, that would only indicate that the 4(d) Rule is *over*protective.

5. The 4(d) Rule meets the requirements of the ESA, which authorizes the Service to prescribe measures that it deems "necessary and advisable to provide for the conservation" of threatened species. 16 U.S.C. § 1533(d). CBD says that the 4(d) rule is insufficient because it will not help the Beetle's recovery, which is implicit in the ESA's definition of "conservation." Br. 37; *see also* 16 U.S.C. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"). CBD describes habitat loss from soil-disturbing activities as a "primary threat," Br. 38, but that adjective does not show that prohibiting incidental take from soil-disturbing activities is necessary for the conservation of the species. While it is true that the Service identified habitat loss as the second most significant threat to the Beetle after climate change, the Service's analysis of habitat loss concluded that land-use changes alone would not reduce the resiliency of Beetle populations in the Southern Plains Analysis

49

Areas. FWS141, 1471. CBD is thus incorrect when it suggests that land-use changes are likely to limit the Beetle's recovery.

The ESA confers wide discretion on the Service to determine what measures are "necessary and advisable." *See Trout Unlimited v. Lohn*, 559 F.3d 946, 962 n.12 (9th Cir. 2009) ("The combination of the discretionary 'may' and the phrase 'necessary and advisable' grant NMFS much leeway in crafting regulations."). Given that the Service found that habitat conversion is not a significant threat to the Beetle in the Southern Plains, prohibiting incidental take from soil-disturbing activities is not only unnecessary, but it would also do little to improve the Beetle's prospects.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Christopher Anderson*
TODD KIM

Of Counsel:

Joan Marsan
  *Attorney-Advisor*
Office of the Solicitor
U.S. Department of the Interior

October 24, 2024
90-8-6-08461

  *Assistant Attorney General*
KAMELA A. CASHETTE
KEVIN W. MCARDLE
CHRISTOPHER ANDERSON
  *Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
christopher.anderson3@usdoj.gov

50

## **CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 10,680 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Georgia font.

*/s/ Christopher Anderson*
CHRISTOPHER ANDERSON

Counsel for Appellees

# ADDENDUM

16 U.S.C. § 1532 ........................................................ 1a

16 U.S.C. § 1533 ........................................................ 3a

16 U.S.C. § 1538 ........................................................ 8a

50 C.F.R. § 17.31 ........................................................ 9a

**United States Code**
**Title 16. Conservation**
**Chapter 35. Endangered Species**

**§ 1532. Definitions**

For the purposes of this chapter—

\* \* \*

**(3)** The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

\* \* \*

**(6)** The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

\* \* \*

**(15)** The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

\* \* \*

**(19)** The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

**(20)** The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

\* \* \*

**United States Code**
**Title 16. Conservation**
**Chapter 35. Endangered Species**

## § 1533. Determination of endangered species and threatened species

(a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

\* \* \*

(b) Basis for determinations

(1)(A) The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been—

(i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

(ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

\* \* \*

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that—

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii)The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7  to prevent a significant risk to the well being of any such species.

*  *  *

(c) Lists

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any,

specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b).

(2) The Secretary shall—

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should—

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b).

(d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to

section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

\* \* \*

(f) Recovery plans

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan—

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

\* \* \*

**United States Code**
**Title 16. Conservation**
**Chapter 35. Endangered Species**

## § 1538. Prohibited acts

(a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

(A) import any such species into, or export any such species from the United States;

(B) take any such species within the United States or the territorial sea of the United States;

(C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

**Code of Federal Regulations**
**Title 50. Wildlife and Fisheries**

**§ 17.31. Prohibitions**

(a) Except as provided in §§ 17.4 through 17.8, or in a permit issued pursuant to § 17.32, the provisions of paragraph (b) of this section and all of the provisions of § 17.21 (for endangered species of wildlife), except § 17.21(c)(3) and (5), apply to threatened species of wildlife, unless the Secretary has promulgated species-specific provisions (see paragraph (c) of this section).

\*   \*   \*

(c) For threatened species of wildlife that have a species-specific rule in §§ 17.40 through 17.48, the provisions of paragraph (b) of this section and § 17.32 apply unless otherwise specified, and the species-specific rule will contain all of the prohibitions and any additional exceptions that apply to that species.

9a