ORAL ARGUMENT NOT YET SCHEDULED

No. 23-5285

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellant*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, DIRECTOR MARTHA WILLIAMS, SECRETARY DEB HAALAND, and UNITED STATES DEPARTMENT OF THE INTERIOR,

*Defendants-Appellees*

---

## PLAINTIFF-APPELLANT'S REPLY BRIEF

---

Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-00791-TJK

---

Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
Tel: (406) 544-9863
kakland@biologicaldiversity.org

Eric R. Glitzenstein
Center for Biological Diversity
1411 K St., N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8401
eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY ............................................................................................. v

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ........................................................................................... 3

   I.   The Service's Downlisting Decision Violates the Plain Language of the ESA and is Otherwise Arbitrary and Capricious. ................................... 3

       A.   The Service's Downlisting Decision Violates the Plain Meaning of the ESA's Definitions of "Threatened" and "Endangered" Species. ........... 3

       B.   The Government's Contention that the Beetle's Extinction in the Southern Plains is not Sufficiently Imminent to Warrant Listing as Endangered has No Basis in the Statute and is Arbitrary and Capricious. ................................................................ 8

       C.   The Service's Failure to Articulate any Standard for Listing a Species Imperiled by Climate Change as Endangered Renders its Decision Arbitrary and Capricious. ................................... 12

   II.   The 4(d) Rule Fails to Provide for the Conservation of the Beetle and is Arbitrary and Capricious. ............................................. 15

   III.  Vacatur is Proper in This Case. ..................................... 22

CONCLUSION ......................................................................... 24

CERTIFICATE OF COMPLIANCE............................................ 26

CERTIFICATE OF SERVICE ................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ...................................................................... 23, 24

*Bennet v. Spear*,
  520 U.S. 154 (1997) .......................................................................................... 7

*Ctr. for Biological Diversity v. Haaland*,
  998 F.3d 1061 (9th Cir. 2021) .......................................................................... 7

*Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act
  Listing),* 794 F. Supp. 2d 65 (D.D.C. 2011) ................................................... 13

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ..................................................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 12, 18

*Nat'l Parks Conservation Ass'n v. Semonit*e,
  422 F. Supp. 3d 92 (D.D.C. 2019) ................................................................. 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ...................................................................... 23

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .......................................................................................... 5

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................... 22

16 U.S.C. § 1532(20) ................................................................................. 4, 5, 8, 10

16 U.S.C. § 1532(3) .............................................................................................. 16

16 U.S.C. § 1532(6) ................................................................................. 3, 5, 8, 10

16 U.S.C. § 1533(a)(1) .......................................................................................... 15

16 U.S.C. § 1533(b)(1)(A) .................................................................................... 14

16 U.S.C. § 1533(b)(4) .......................................................................................... 15

16 U.S.C. § 1533(b)(5) .......................................................................................... 15

16 U.S.C. § 1533(d) .............................................................................................. 16

## Other Authorities

79 Fed. Reg. 43504 (July 25, 2014) ........................................................ 24

Okla. Admin. Code § 800:30-1-11 ........................................................ 20

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Beetle | American Burying Beetle |
| ESA | Endangered Species Act |
| Service | U.S. Fish and Wildlife Service |

## SUMMARY OF ARGUMENT

1. The decision by the Fish and Wildlife Service ("Service") to downlist the American burying beetle ("Beetle") from "endangered" to "threatened" contradicts the plain language of the Endangered Species Act ("ESA" or "Act") in view of the Service's own findings that, due primarily to climate change, the Beetle will be lost from almost 60% of its remaining range in as soon as 15 years and within what the agency itself defines as the "foreseeable future." The government concedes that the Service stripped the Beetle of its endangered status despite predicting "that the species *will become extirpated from the Southern Plains in the 2040-2069 time period*"), Federal Appellees' Brief ("Govt. Br.") 22 (emphasis added), and that "the Beetle is likely to be extirpated from the Southern Plains Analysis Area within the mid-century time period." *Id.* at 17. Based on the best available science, the Beetle is therefore facing extinction in a significant portion of its range within the foreseeable future. *See also* FWS192 ("*Within the foreseeable future*, *i.e.*, the mid-century time frame (2040-2069), all Southern Plains analysis areas are expected to exceed threshold temperatures under both the RCP 4.5 and 8.5 emissions scenarios, *likely resulting in extirpation of the American burying beetle from these areas*.") (emphasis added); FWS188 (explaining that the established "temperature threshold" for the Beetle's survival will be "consistently exceed[ed] … by 2040 in the Southern Plains" and that the "foreseeable future" as "established by the

American burying beetle recommendation team" is "2040-2069, or mid-century timeframe").[1]

As explained in the Center's Opening Brief ("Center Br."), the ESA defines a "threatened" species as one that will become *endangered* within the "foreseeable future," not one that the Service predicts will become *extinct* in all or a significant portion of its range within the foreseeable future. Center Br. 27. The government has no response to that plain language argument, which is fatal to its position. Nor does the government coherently explain why the Beetle's plight does not fit the statutory endangered definition to a tee, especially given the Service's finding that the foreseeable extinction event is *already* under way in a substantial portion of the Southern Plains. *See* Govt. Br. 32 (conceding that the "Red River Analysis Area"—one of only three Analysis Areas in the Southern Plains—"is *now* experiencing temperatures at or near the threshold for unsuitability") (emphasis added); *see also* Brief of Amici Curiae Scientific Experts ("Scientists' Br.") 14 (describing the "imminent danger climate change poses" for the Beetle and that the "Beetle has not been found in the Red River Analysis Area's Texas or Arkansas portions in over a decade, suggesting that its climate-induced extirpation has

---

[1] The government evidently concedes that the Southern Plains constitutes a "significant portion" of the beetle's range within the meaning of the ESA's endangered and threatened definitions. *See* Govt. Br. 2 (stating that the Service predicts that within "about 20 years" temperatures "will rise sufficiently to threaten the Beetle's viability *in a significant portion of its range*") (emphasis added).

already begun"). Because the downgrading of the Beetle's status contravenes the plain language of the ESA and the Service's own findings in the record, and is otherwise arbitrary and capricious, the Court should vacate and thereby restore the endangered status the species benefitted from for decades.

2. The second issue on appeal concerns the validity of the Service's section 4(d) Rule—an issue the Court need not address if it vacates the downlisting rule. The government fails to justify how stripping the Beetle of vital protections in the most vulnerable portion of its range aligns with the Act's requirement to promote "conservation" of the species. Climate change poses an existential threat in the Southern Plains. Contrary to the government's reasoning, this threat does not replace or extinguish the threat of land-disturbing impacts, but compounds it. Despite this, the government argues that the impacts of such activities are "minor" and may proceed without even the most minimal safeguards. That reasoning is the opposite of conservation and is arbitrary and capricious.

## ARGUMENT

**I.    The Service's Downlisting Decision Violates the Plain Language of the ESA and is Otherwise Arbitrary and Capricious.**

**A.    The Service's Downlisting Decision Violates the Plain Meaning of the ESA's Definitions of "Threatened" and "Endangered" Species.**

The ESA's definition of an "endangered" species is one that "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

The definition of a "threatened" species is one that "is likely to become an endangered species throughout all or a significant portion of its range within the foreseeable future." *Id*. § 1532(20). As the Center explained in its Opening Brief, given the Service's own factual findings regarding the status of the Beetle in the Southern Plains, the plain language of the ESA compels the conclusion that the species is endangered rather than threatened in that portion of its range. Center Br. 27.

Nonetheless, the government asserts that the issue here is "not a question of statutory interpretation," Govt. Br. 29, and that the Center's arguments "amount to nothing more than competing views about policy and science." *Id.* at 26. This argument must fail. The core issue here is indeed one of statutory interpretation: whether the Service's own determination—that a species facing near-certain extinction as soon as 2040 in a significant portion of its range qualifies as threatened rather than endangered—aligns with the plain terms of the Act. As explained in the Center's Opening Brief, the statutory definition of a threatened species applies to one that is "likely to become *endangered*," not one that is (as here) "likely to become *extinct* in the foreseeable future." Center. Br. 29

Accordingly, there is an irreconcilable mismatch between the Service's downlisting decision and the statutory definition.[2]

The government has no response (and there is none). Rather, it mistakenly claims that the "only difference between an endangered and a threatened species is the timing of the endangerment." Govt. Br. 22. Even if that were so, the Service's finding that the Beetle faces extinction in a significant portion of its range in the foreseeable future would foreclose downlisting. But the plain language of the ESA definitions reflects that the *degree of certainty* of an extinction event in the "foreseeable future" is also a relevant factor. A threatened species is only "likely" to become endangered at some point in the foreseeable future, 16 U.S.C. § 1532(20), whereas an endangered species "*is* in danger of extinction." *Id.* § 1532(6) (emphasis added).

For example, a species that exists in a single water body that will be destroyed by a dam project "*is* in danger of extinction" even if the dam will not be completed for a number of years. *See, e.g., Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 184 (1978). Likewise, a species that, based on the best available science,

---

[2] What constitutes the "foreseeable future" and whether it is "necessarily context dependent" is not at issue here. Govt. Br 39. The Center *accepts* the Service's characterization of the "foreseeable future" as the "2040-2069, or mid-century timeframe." FWS188. Rather, the issue here is that, according to the plain statutory language, the Service's characterization of that "foreseeable future" (predictable extinction in a significant portion of the species' range) describes an endangered species rather than a threatened one.

*will* be lost due to climate change in the foreseeable future "*is* in danger of extinction" and not merely "*likely*" to become endangered at some point. That is the situation here. As the government concedes, the "Service has predicted that the species *will become extirpated* from the Southern Plains in the 2040-2069 time period*.*" Govt. Br. 22 (emphasis added).

Yet the government fails to explain how this predicted scenario does not place the beetle "*in danger of* extinction" by any reasonable interpretation of that term. Instead, the government dismisses the Center's assertion that the Beetle is currently experiencing an extinction event in the Southern Plains as "incorrect." Govt. Br. 33. However, it is hard to find a better description of a situation in which the populations are currently declining due to climate change, FWS1479, with impacts that, according to the agency's best available science, are expected to persist and lead to complete extirpation in the foreseeable future. FWS191, 1484, 1500.

The government does not (and cannot) seriously dispute that, given the Beetle's known habitat requirements and current and projected climate change impacts, its projected extinction in the Southern Plains is about as certain as a scientific prediction can be. The Service's own characterization of the best available science is that the Beetle cannot survive above a temperature threshold of

95° F. *See* FWS1482.[3] Due to the inexorable effects of climate change, these thresholds are already being exceeded in the southernmost portions of the Beetle's range and will be exceeded in the entirety of the Southern Plains as early as 2040, if not sooner. *See* Govt. Br. 22 (conceding "the species will become extirpated from the Southern Plains in the 2040-2069 time period."); FWS1497 (stating that most "Southern Plains analysis areas will be near or exceed threshold temperatures *by 2039*") (emphasis added); FWS186 ("populations in the Southern Plains … are projected to be lost within the mid-century time period"); *see also* Scientists' Br. 13 (explaining that "nearly all of the Southern Plains areas are projected to experience temperatures above or alarmingly close to this threshold *during* the early century timeframe (2010-2039)") (citing FWS1484, 1488).[4]

_____

[3] Notwithstanding the government's suggestion that "the exact [temperature] thresholds for beetle survival are unknown," Govt. Br. 10, n.5, the Service determined that "areas that average mean maximum temperatures above 95° F are not likely to support populations" and that "[f]or evaluating the effects of future climate changes on the resiliency of all analysis areas, we are assuming a mean maximum temperature threshold of 95° F." FWS1482; *also see* FWS 1374 ("few Nicrophorus species appear to be capable of maintaining populations in areas with average summer mean-maximum temperatures at or exceeding the 95° F threshold").

[4] There is no evidence that the Beetle is adapting or will be able to adapt to these extreme temperatures resulting from climate change, FWS1490, and the ESA's best available science standard forecloses reliance on "speculation or surmise." *Bennet v. Spear*, 520 U.S. 154, 176 (1997); *see also* Govt. Br. 32 (conceding that it is "unlikely" that the "Beetle will be able to adapt to higher temperatures"). Consequently, mere conjecture that such adaptation may be "possible," *id*., cannot support the Beetle's downlisting. *See Ctr. for Biological Diversity v. Haaland,* 998 F.3d 1061, 1069 (9th Cir. 2021) (remanding the Pacific walrus listing decision in

The government acknowledges that "[f]or a species to be endangered, its extinction need not be certain or inevitable, and the Service may classify a species as endangered even if the likelihood of its extinction cannot be estimated." Govt. Br. 28. It logically follows that where, as here, the best available science demonstrates that a species' extinction *is* virtually "certain or inevitable" within the Service's own characterization of the "foreseeable future," that this is a paradigmatic situation where the species' listing as endangered should be retained. In any case, the "best reading" of the ESA, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2249 (2024), is that the Beetle, which faces extinction in a significant portion of its range in the foreseeable future, satisfies the plain language definition of an endangered species rather than that of a threatened species. The Beetle is a species that "is in danger of extinction" in the Southern Plains in the foreseeable future, not one that is only "likely to become an endangered species in the foreseeable future" in that portion of its range. 16 U.S.C. § 1532(6), (20).

**B.  The Government's Contention that the Beetle's Extinction in the Southern Plains is not Sufficiently Imminent to Warrant Listing as Endangered has No Basis in the Statute and is Arbitrary and Capricious.**

---

part due to the Service's reliance on "the potential for walruses to change behavior to adapt to the loss of sea ice" despite the lack of evidence "as to whether the Pacific walrus will actually find land habitat to be equivalent to sea ice.").

The government argues that the Service was justified in downlisting the Beetle because the "risk of the Beetle's extinction in the near-term is low," Govt. Br. 23, meaning that the "Beetle's extirpation from the Southern Plains is neither imminent nor certain." *Id.* at 41. There are multiple flaws in this argument. First, as explained, it has no basis in the plain language of the ESA and the Service's own characterization of the predictable effects of climate change on the Beetle's known habitat requirements allow for little doubt as to the "existential" threat to the species in the Southern Plains. FWS183 (explaining that "changes in climate within the foreseeable future is an existential risk … to those populations in the southern portion of the species range").[5]

Second, neither the Service's decision nor the government's brief ever delineates what is meant by "near-term" or why that does not apply to a species that the government concedes may no longer be viable in the Southern Plains analysis area within two decades. Govt. Br. 2 (emphasis added). The Court has been given no sense whatsoever as to where or how the government draws the line between "near" and long-term or how it would decide when extinction is sufficiently imminent, *id.* at 41 to (again) classify the Beetle as endangered.

---

[5] The government's argument also contradicts it's previous concession that "extinction need not be certain or inevitable" to classify a species as endangered. Govt. Br. 28.

The government's argument that extinction is not sufficiently imminent because climate change impacts have yet to drive the Beetle to extinction throughout the entirety of the Southern Plains, *id.* at 28, directly contradicts the ESA's future-oriented definition of "endangered." The government claims that "[w]hat matters is whether the species' current circumstances are such that they put the species at *present* risk of extinction." *Id*. This interpretation, however, deviates from the statutory language ("in danger of extinction") which, as explained above, means that if a species will predictably be lost due to climate change in the foreseeable future, it "is in danger of extinction" and not simply "threatened." 16 U.S.C. §§ 1532(6), (20). Even applying its own standard, however, the government again fails to justify why a species facing potential extinction across a significant portion of its range within less than two decades is not "at *present* risk of extinction," Govt. Br. 27-28 (emphasis added), or why this risk of extinction should not be considered "near-term." *Id.* at 23, 31.

Third, however the government might define the "near-term," the indisputable fact is that the "existential" crisis facing the Beetle in the Southern Plains is already under way. FWS1479. The government concedes that "the Beetle is *presently* experiencing adverse impacts from climate change … in the Southern Plains," Govt. Br. 32 (emphasis added), and the record establishes that major areas have already become uninhabitable or are near the temperature threshold where

they will be. *See* FWS1479, FWS1487-89. The government's claim that "the current 'magnitude' of climate change in the Southern Plains is 'low'" because only the Red River Analysis area is "now experiencing temperatures at or near the threshold for unsuitability," Govt. Br. 32, mischaracterizes the Service's findings. The Service concluded that with "[e]ven the most optimistic scenario," future resiliency is considered zero for the Red River by 2039, "and zero for all southern analysis areas for any longer time frame." FWS1490. This means that after 2039, all populations in the Southern Plans will have no ability to "withstand random, non-catastrophic threats to its survival." Govt. Br. 11; *see also* FWS185 (explaining that within the "mid-century time period," *i.e.*, as soon as 2040, "all Southern Plains areas are expected to exceed threshold temperatures … likely resulting in extirpation of the [Beetle] from these areas").

    In any event, the government concedes that the anticipated extinction event due to rising temperatures is already under way in at least 14% of the Southern Plains. Govt. Br. 36 n.13. Thus, far from occurring in some far-off future, the extinction scenario is occurring in real time, *see* FWS184 ("Southern populations of [Beetles] that experience summer mean-maximum temperatures near 95 [degrees] are declining"), with complete "extirpation of the American burying beetle from these areas" projected within the "mid-century time period," *i.e.*, as soon as 2040. FWS185. Yet again, the government proffers no explanation as to

how such a risk of extinction can reasonably be considered non-"imminent" even applying the government's own (non-textual) approach to delineating between endangered and threatened designations.

>C.     **The Service's Failure to Articulate any Standard for Listing a Species Imperiled by Climate Change as Endangered Renders its Decision Arbitrary and Capricious.**

The government maintains that the Service "was not required to articulate" any "standard" for distinguishing, based on climate change effects, a threatened from an endangered species, Govt. Br. 23-24. At the same time, the government says the Service may, due to such threats, return the Beetle to the endangered list when it is deemed "appropriate," Govt. Br. 2—but without providing any clue as to how, when, or on what basis in the Beetle's present and ongoing downward spiral in the Southern Plains the Service might make such a determination. Even putting to one side the plain language of the ESA, elementary APA requirements mean that the "agency must … articulate a satisfactory explanation," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), for what a "near-term" risk of extinction means and why that does not apply where "[i]mpacts from changing climate are ongoing [] and populations in the Southern Plains analysis areas are projected to be extirpated within 20 to 30 years." FWS193.

The government's comparison to the polar bear's listing as threatened, *Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act*

*Listing),* 794 F. Supp. 2d 65 (D.D.C. 2011)—a decision that was upheld applying the *Chevron* framework—to support its argument is inapposite. Here, the record reflects that the Beetle has already experienced significant range restrictions in the Southern Plains, FWS1487, whereas evidence before the Service for the polar bear did not show such a reduction in range. *Polar Bear,* 794 F. Supp. 2d at 84. While "both species face serious long-term threats because of climate change," Govt. Br. 39, both the level of certainty of effects (due to advances in climate change modeling) and the timeframe for climate change impacts for the two species are vastly different. *See Polar Bear,* 794 F. Supp. 2d*.* at 75, 90, n. 28 (discussing projections for 75-100 years into the future). Moreover, the government's contention that "both species are currently stable" contradicts the Service's finding here that climate change is already killing off Beetles in the Southern Plains and will continue to do so until the entire analysis area is extirpated as soon as 2040. FWS191, 1484, 1500.[6]

The government claims that even though the Beetle is expected to "experience significant effects sooner [than the polar bear], [it] does not change the basic point that those impacts will only threaten the species viability in the future."

---

[6] If anything, the Service's projections significantly understate the rapid pace of climate change that the Beetle and other species are now experiencing. *See* World Meteorological Organization, *Press Release: Greenhouse gas concentrations surge again to new record in 2023* (Oct. 28, 2024), https://wmo.int/news/media-centre/greenhouse-gas-concentrations-surge-again-new-record-2023.

Govt. Br. 40. In essence, the government suggests that the timing of extinction is irrelevant, and so that as long as extinction happens "in the future," the species qualifies as threatened rather than endangered. This again contradicts the ESA's future-oriented definition of endangered. And by the government's logic, even a species destined for extinction within a few years would also still be considered merely threatened because the government fails to explain how much "sooner" a species must "experience significant effects" to be deemed endangered.

The government claims that the Service continues to monitor the Beetle's status, asserting that "twenty years is more than sufficient time" for the Service to reclassify the Beetle as endangered if temperature increases warrant such a designation. Govt. Br. 37. However, this approach begs the question: how much decline is too much? Would the Service wait until 30% of the Southern Plains is lost? 50%? As the Amici explain, the reality is that there is no such on/off threshold for when a species becomes endangered in an extinction scenario like that involved with as climate change. *See* Scientists' Br. 9.[7]

---

[7] Indeed, the Service's refusal to retain the Beetle's endangered status despite the agency's own dire predictions suggests that there is something about climate change as a principal threat that predisposes the agency against listing a species as endangered on that basis. If so, that is also contrary to the plain language of the ESA requiring the Service to make *all* listing determinations "solely on the basis of the best scientific … data available." 16 U.S.C. § 1533(b)(1)(A). Likewise, the statute's delineation of the "factors" that the Service must consider in making endangered determinations puts any "other natural or manmade factors affecting [a species'] continued existence"—which includes climate change—on the same

14

Furthermore, any notion that the Service would (or could) quickly return the species to endangered status if that is deemed "appropriate" based on the agency's (undisclosed) criteria, Govt. Br. 2, is disingenuous. Reclassification would require a new round of public notice and comment and additional processes that would take years under the best of circumstances. *See* 16 U.S.C. §§ 1533(b)(4), (5). In reality, given the agency's severe backlog of listing determinations[8] and the time it typically takes to complete such actions—including the five-year review of the Beetle announced over a year ago that still lacks a published document, Govt. Br. 37—the suggestion that rapid (or any) reclassification would occur before the Beetle is lost forever in the Southern Plains strains credulity.

## II.    The 4(d) Rule Fails to Provide for the Conservation of the Beetle and is Arbitrary and Capricious.

If the Court agrees that the Beetle's downlisting should be vacated, it need not address the validity of the 4(d) rule. If the Court nevertheless does so, a rule that strips the Beetle of any legal protection in the vast majority of its habitat in the Southern Plains—the region most at risk of extirpation—does not promote the

---

plane as threats such as the "present or threatened destruction, modification, or curtailment of [the species'] habitat or range" or "disease or predation." *Id.* § 1533(a)(1).

[8] *See* https://www.fws.gov/testimony/listing-and-delisting-processes-endangered-species-act#:~:text=We%20are%20asking%20Congress%2C%20through,that%20meets%20with%20wide%20approval.

Beetle's "conservation," 16 U.S.C. § 1533(d), *i.e.*, recovery, *id.* § 1532(3) (defining "conservation" as recovery), and is arbitrary and capricious.

The government acknowledges that "it is true that the Service identified habitat loss as the second most significant threat to the Beetle after climate change," Govt. Br. 49, and that the "SSA identified two primary threats to the viability of the Beetle: habitat loss due to land-use changes and effects related to climate change." *Id*. at 13 (citing FWS1432-33). Yet the government simultaneously asserts that "[l]and use changes … that cause habitat loss and fragmentation are a minor risk" and "are not considered a threat to the species in" the Southern Plains *Id.* at 45 (citing FWS195).

This contradictory position is inconsistent with the Service's own findings in the SSA, which identify habitat loss from soil disturbing activities—including intensive agricultural land uses and logging—as primary threats to the Beetle in the Southern Plains, *along with* climate change. *See, e.g.*, FWS1386 (SSA: "Land use from agriculture and silviculture (pine plantations) practices make much of this [Red River] area marginal for [Beetle] use"); *id*. (SSA: "Current risk factors [in the Red River analysis area] include habitat loss and alteration due to intensive agricultural land uses, commercial forestry, and some areas of urban development."); FWS1388 (SSA: "The large percentage of conditional habitat makes the ABB in this analysis area [Arkansas River] more sensitive to changes in

16

land uses such as grazing or haying that affect habitat suitability"); *id.* ("Current risk factors include habitat loss/alteration due to agricultural land uses … commercial forestry, energy related projects, and some areas of urban expansion."); FWS1389 (SSA: "Current risk factors [in the Flint Hills analysis area] include habitat loss/alteration due to agricultural land uses and some areas of urban expansion").

While the government claims that "habitat loss due to [l]and-use changes … that cause habitat loss and fragmentation" may be considered a "minor risk" in the Southern Plains, Govt. Br. 44, that is so only insofar as it is relative to climate change, which poses such an immediate and existential threat to the species that it renders "all other future risk factors irrelevant" by comparison. FWS1487. However, while that underscores why the Beetle should be listed as endangered, it does not negate the ongoing threat of habitat loss and fragmentation in the Southern Plains that is documented in the SSA.

In fact, when factoring in the threat of climate change, habitat destruction from soil disturbing activities to Beetles in the Southern Plains becomes just as harmful, if not more so, than in the Northern Plains. The Service itself acknowledges that "[e]ffects to habitat associated with extended droughts would tend to increase grazing pressure on pasture lands and reduce the ABB habitat conditions on a large, but unknown, percentage of the conditional land covers."

FWS1442. Not only are the overall threats to Beetles more severe in the Southern Plains, oil and gas activity is also "locally high in portions of [the Southern Plains] analysis area." FWS1388. Indeed, the final listing decision flatly concedes that "risks associated with grazing, silviculture, and oil and gas development *are more common in the Southern Plains analysis areas*" than in the Northern Plains. FWS183 (emphasis added). In addition, the "*combined effects of land use* and future changes in climate are likely to impact the resiliency of *most populations and the overall viability of the species*." *Id.* (emphasis added). Yet the 4(d) rule maintains longstanding protections against habitat destruction and degradation in the Northern Plains while largely eliminating them in the Southern Plains.

The government fails to explain how that counterintuitive result is consistent with the record, the Service's own findings, or the ESA's "conservation" mandate. At minimum, applying fundamentally different protections to the Northern and Southern Plains despite evidence in both regions of threats from soil-disturbing activities —at least some of which are concededly greater in the Southern Plains— "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 63.

Additionally, the government is unable to provide support for its rationalization that the threat of soil disturbing activities in the Southern Plains is buffered by the availability of potential habitat. Govt. Br. 45. The majority of "available habitat" in Oklahoma (most of the Southern Plains analysis area) is

18

privately owned forested habitat that once supported Beetles but has been, and continues to be, steadily logged, and thus cannot be relied upon to provide habitat now or into the future. FWS5053; FWS1386, 1388, 1389. The SSA found that major areas of potential habitat for the Beetle are no longer considered "favorable" due to "intensively managed pine plantations and forested areas" and grassland/pasture lands used for grazing and hay productions. FWS1388.

The government's assertion that "there are nearly 20 million acres of suitable Beetle habitat in the Southern Plains," Govt. Br. 47, ignores the fact that, due to the very land-disturbing activities now exempt from any protections, a huge percentage of those acres are *not* considered "favorable" for the Beetle but, rather, "marginal" or "conditional." FWS1384. "Conditional" habitats encompass "[l]and covers that can be favorable under some conditions and unsuitable under others," such as pasture land in the Southern Plains "if it is heavily grazed or frequently mowed." *Id.* According to the SSA, such "conditional habitat" constitutes more than *9 million* of the acres deemed "potential habitat" for the Beetle. FWS1585. Far from supporting the elimination of any and all protections in such areas, as the 4(d) rule accomplishes, these facts highlight the urgent need for maintaining such protections.

In this context, it is hardly "baffling[]," Govt. Br. 48, for the Center to point to the arbitrariness—insofar as the Beetle's "conservation" is concerned—of the

Service's decision to extend ESA safeguards to areas in the Southern Plains already protected as "conservation lands" while at the same time dispensing with them entirely in the vast majority of areas where the Beetle lacks any such protection. As explained in the Center's Opening Brief, the 4(d) Rule limits incidental take in the Southern Plains in narrowly defined "conservation lands," which offers little real-world protection, as there is little to no "land development" within such "conservation lands." *See* Center Br. 40.

The government's claim that "those safeguards could be lost without ongoing ESA protections," Govt. Br. 48-49, is unsupported by the record. For example, land development is prohibited in Oklahoma Wildlife Management Areas, regardless of whether there is an ESA listed species present. *See* OKLA. ADMIN. CODE § 800:30-1-11 ("No permanent or temporary structure (buildings, earthworks, corrals, boat docks, marinas, boat landings, launch ramps, etc.) may be constructed on Department lands."). To be clear, while the Center has no objection to the Service's adoption of a rule that may be redundant or even "overprotective" as to such areas, Govt. Br. 49, it reinforces the arbitrariness of the agency's failure to apply *any* protections whatsoever to the vast majority of Beetle habitat in the Southern Plains.

As for the Service's rationale that the "combined permanent loss of habitat projected due to urban and agricultural expansion is less than 2 percent" in the

Southern Plains, FWS195, the government argues that "[t]wo percent is a small percentage, and given the size of the denominator, it was *implicit* in the Service's explanation that the remaining available habitat would be more than adequate to support the Beetle's conservation." Govt. Br. 47 (emphasis added). This argument fails for two reasons.

First, the government does not address what "*permanent* habitat loss" means and why the loss of habitat needs to be permanent to be harmful to the species. FWS193 (emphasis added). Indeed, as just explained, much of the acreage that the government includes in its "denominator" of "20 million acres of suitable Beetle habitat in the Southern Plains," Govt. Br. 47, are areas that, according to the SSA, may be *managed* in a manner that is not conducive to Beetle survival or recovery. FWS1384. Those practices may not entail "permanent" habitat loss, but they are nonetheless harmful to Beetle survival and recovery. In short, both the government's "denominator" and its 2% figure are seriously skewed.

Second, even if the 2% figure accurately reflected the *current* amount of available habitat potentially impaired by land use activities (which it does not), it ignores the Service's projections of ongoing losses of habitat in the Southern Plains due to climate change. In other words, the "denominator" touted by the government is not static. When climate change unfolds as projected, what is now a

2% loss would likely grow much greater over time, as usable habitat continues to rapidly decline.

This means that the same level of land disturbance may represent a much larger percentage of the remaining habitat. Climate change is expected to further reduce habitat in the Southern Plains. FWS1490. Consequently, the denominator of available habitat will continue to shrink, making the impact of habitat loss from cropland conversion and other impacts increasingly significant. Accordingly, it is far from "implicit" or "self-evident," Govt. Br. 47, that what the Service (erroneously) characterizes as a relatively small impact now will remain inconsequential to the Beetle's conservation as habitat shrinks. At a minimum, the agency itself—not government counsel or the district court—must set forth an adequate explanation. The Service's failure to do so renders the decision arbitrary and capricious.

## III.    Vacatur is Proper in This Case.

The presumptive remedy for unlawful and arbitrary and capricious actions under the ESA and APA is vacatur. 5 U.S.C. § 706(2)(A). The test for whether a court should vacate a deficient agency action "depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-

51 (D.C. Cir. 1993). "Because vacatur is the default remedy … defendants bear the burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonit*e, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). The government fails to do so here.

The seriousness of the agency's errors is determined "by whether there is a significant possibility that the [Service] may find an adequate explanation for its actions on remand" and thereby reach the same result. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). Here, in light of the Service's legal violations as outlined above and in the Center's Opening Brief, the presumptive remedy of vacatur is appropriate.

First, the seriousness of the Service's violations—leading to the removal of protections for a species already facing significant risk—supports vacating the Downlisting Rule and reinstating the 1989 Endangered Rule to provide crucial regulatory safeguards and help ensure the Beetle's continued existence in the wild. There is a little if any possibility that the Service could adequately justify a downlisting decision on remand if this Court finds that the Beetle qualifies as endangered based on the plain language of the ESA. The record indicates that climate threats are expected to intensify and that extinction risks will likely accelerate, leaving the Service unable to "find an adequate explanation … on remand." *Standing Rock Sioux*, 985 F.3d at 1051.

Second, there would be no "disruptive consequences of an interim change" weighing against vacatur. *Allied-Signal*, 988 F.2d at 150-51. The fact that the Beetle was listed as endangered for decades demonstrates that private parties can comply with the ESA while also affording essential protections for the Beetle. For example, the oil and gas industry continued operations with an endangered listing under the Service's "Oil and Gas Industry Conservation Plan Associated with Issuance of [ESA] Section 10(a)(1)(B) Permits for the American Burying Beetle in Oklahoma." 79 Fed. Reg. 43504 (July 25, 2014); FWS708. This plan allowed "incidental take of the [beetle]" during oil and gas development activities in exchange for "measures necessary to minimize and mitigate impacts to the maximum extent practicable." 79 Fed. Reg. at 43504. Therefore, the absence of disruptive consequences coupled with the unlikely ability of the Service to cure its errors indicates that vacatur is the appropriate remedy in this case.

## CONCLUSION

For the foregoing reasons, the Center respectfully requests this Court reverse the district court's ruling and vacate the Service's downlisting decision as contrary to the ESA and APA. Should the court decline to vacate the downlisting, the 4(d) Rule should be vacated insofar as it eliminates protections for the beetle in the Southern Plains.

Dated: November 26, 2024        Respectfully submitted,

/s/ Kristine M. Akland
Kristine Akland (D.C. Cir. Bar No. 64933)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

/s/Eric R. Glitzenstein
Eric R. Glitzenstein (D.C. Bar No. 358287)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St., N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(e)(2) because this brief contains 5,825 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Respectfully submitted this 26th day of November, 2024.

*/s/ Kristine M. Akland*
Kristine M. Akland

**CERTIFICATE OF SERVICE**

The undersigned certifies that the Opening Brief of Plaintiff-Appellant the Center for Biological Diversity is being electronically filed with the Clerk of the Court for the United States Court of Appeals by utilizing the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 26th day of November, 2024.

*/s/ Kristine M. Akland*
Kristine M. Akland