**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 11, 2025**

**No. 23-5285**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellant*,

v.

UNITED STATES FISH AND WILDLIFE SERVICE, DIRECTOR MARTHA
WILLIAMS, SECRETARY DEB HAALAND, and UNITED STATES
DEPARTMENT OF THE INTERIOR,

*Defendants-Appellees*

---

**PLAINTIFF-APPELLANT'S FINAL OPENING BRIEF**

---

Appeal from the United States District Court
for the District of Columbia
No. 1:21-cv-00791-TJK

---

Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
Tel: (406) 544-9863
kakland@biologicaldiversity.org

Eric R. Glitzenstein
Center for Biological Diversity
1411 K St., N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8401
eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1)(A), Plaintiff-Appellant the Center for Biological Diversity submits the following Certificate as to Parties, Rulings, and Related Cases.

### A.     Parties and Amici

The following parties appeared before the district court and are parties in this appeal:

1.     <u>Plaintiff-Appellant</u>: Center for Biological Diversity.

2.     <u>Defendants-Appellees</u>: Deb Haaland, in her official capacity as Secretary of the Interior; U.S. Department of the Interior; U.S. Fish and Wildlife Service; Martha Williams, in her official capacity as Director of the U.S. Fish and Wildlife Service.

3.     <u>Amici</u>: Amici in the district court: American Stewards of Liberty; Osage Producers Association; Texas Public Policy Foundation.

### B.     Rulings Under Review

The rulings under review are the Order (ECF 35) and Memorandum Opinion (ECF 36) entered by the U.S. District Court for the District of Columbia (Hon. Timothy J. Kelly) on September 30, 2023, in case number 1:21-cv-00791-TJK. The Memorandum Opinion is set forth in the Appendix at JA-42–98 and has not yet been officially reported.

## C.    Related Cases

There are no related cases within the meaning of D.C. Circuit Rule

28(a)(1)(C) of which undersigned counsel is aware.

Dated: December 24, 2024          Respectfully submitted,

*/s/ Kristine M. Akland*
Kristine Akland (D.C. Cir. Bar No. 64933)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

*/s/Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar No. 358287)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St., N.W., Suite 1300
Washington, D.C.  20005
Tel: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Circuit Rule 26.1(a), Plaintiff-Appellant Center for Biological Diversity is a non-profit organization and certifies that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

Dated: December 24, 2024          Respectfully submitted,

*/s/ Kristine M. Akland*
Kristine Akland (D.C. Cir. Bar No. 64933)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

*/s/Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar No. 358287)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St., N.W., Suite 1300
Washington, D.C.  20005
Tel: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ....................................... iv

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY .................................................................x

STATEMENT OF JURISDICTION.............................................1

STATUTORY AND REGULATORY ADDENDUM ...........................1

STATEMENT OF ISSUES ...................................................1

STATEMENT OF THE CASE .................................................2

    A.    Statutory Context ................................................2

    B.    Factual Background .............................................5

        1.    The Disastrous Decline of the Once-Ubiquitous American Burying Beetle, and the Service's Decision to List the Beetle as "Endangered." ..................................................5

        2.    The Service's 5-Year Review Determining that the Beetle's Endangered Status Should Be Retained Notwithstanding the Discovery of New Populations..........................................8

        3.    The Petition to Delist and the Service's Species Status Assessment ....10

        4.    The Service's Proposed Downlisting and Accompanying 4(d) Rule Stripping the Beetle of Vital Safeguards in the Southern Plains Portion of its Range. ................................................14

    C.    Proceedings Below .............................................19

SUMMARY OF ARGUMENT ................................................20

ARGUMENT ...............................................................21

    I.    Standard of Review...............................................21

II.   The Service's determination that the American burying beetle is not endangered in a significant portion of its range is contrary to the plain language of the ESA and arbitrary and capricious. ........................................22

   A.   The American burying beetle is currently experiencing an extinction event in the Southern Plains and will be extirpated as soon as 15 years from now. ................................................................................................24

   B.   The Service's approach requires the Court to rewrite the plain language of the ESA's definitions of "endangered" and "threatened." ................26

   C.   The Service Has Set Forth No Coherent Explanation for Why the Beetle's Status in the Southern Plains Does Not Qualify as Endangered. ........................................................................................30

III.  The 4(d) Rule violates the ESA because it fails to provide for the conservation of the American burying beetle and arbitrarily eliminates essential protections in the Southern Plains portion of the range. ................33

CONCLUSION ........................................................................................42

ADDENDUM ..........................................................................................A1

# TABLE OF AUTHORITIES

## Cases

*Am. Wildlands v. Kempthorne*,
530 F.3d 991 (D.C. Cir. 2008) ..............................................................21

*BP P.L.C. v. Mayor of Balt.*,
593 U.S. 230 (2021) ............................................................................27

*Ctr. for Biological Diversity v. Everson*,
435 F. Supp. 3d 69 (D.D.C. 2020) ................................... 3, 17, 18, 22

*Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act Listing)*, 794 F. Supp. 2d 65 (D.D.C. 2011) ......................................... 31, 32, 33

*Defs. of Wildlife v. Norton*,
239 F. Supp. 2d 9 (D.D.C. 2002) ..........................................................3

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ....................................................................... 27, 29

*Digit. Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) ............................................................................29

*Fla. Key Deer v. Paulison*,
522 F.3d 1133 (11th Cir, 2008) ...........................................................39

*In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*,
748 F. Supp. 2d 19 (D.D.C. 2010) .......................................................30

*In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*,
818 F. Supp. 2d 214 (D.D.C. 2011) ................................................. 4, 34

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ............................................................................30

*Loper Bright Enters. v. Raimondo*,
219 L. Ed. 2d 832 (2024).............................................................. 22, 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................................................................... 21, 39

*Patel v. Garland*,
596 U.S. 328 (2022) ............................................................................29

*Sturgeon v. Frost*,
587 U.S. 28 (2019) ..............................................................................27

*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) ................................................................ 2, 28, 30

## Statutes

5 U.S.C. § 706 .............................................................................................22

5 U.S.C. § 706(2) ...........................................................................................1

5 U.S.C. § 706(2)(A) .....................................................................................21

16 U.S.C. 1532(20) ................................................................................ 3, 29

16 U.S.C. § 1532(3) ........................................................................... 4, 34, 36

16 U.S.C. § 1532(6) ......................................................... 2, 15, 20, 22, 27

16 U.S.C. § 1533 ...........................................................................................2

16 U.S.C. § 1533(a)(1) ..................................................................................5

16 U.S.C. § 1533(b)(1)(A) .............................................................................4

16 U.S.C. § 1533(c) .......................................................................................5

16 U.S.C. § 1533(c)(2) ..................................................................................8

16 U.S.C. § 1533(c)(2)(A) .............................................................................5

16 U.S.C. § 1533(c)(2)(B)(ii) ........................................................................5

16 U.S.C. § 1533(d)....................................................... 4, 20, 21, 34, 39, 42

16 U.S.C. § 1533(f) .......................................................................................3

16 U.S.C. § 1533(f)(1) ..................................................................................7

16 U.S.C. § 1536(a)(2)........................................................................... 3, 35

16 U.S.C. § 1536(b)(4)................................................................................35

16 U.S.C. § 1538(a)(1) ..................................................................................3

16 U.S.C. § 1538(a)(1)(B) .............................................................................3

16 U.S.C. § 1539(a)(1)(B) ...........................................................................10

16 U.S.C. § 1540(g)(1)(C) .............................................................................1

28 U.S.C. § 1291 ...........................................................................................1

## Regulations

50 C.F.R. § 424.11(d) ...................................................................................3

**Federal Register**

54 Fed. Reg. 29652 (July 13, 1989)..................................................................6

79 Fed. Reg. 37578 (July 1, 2014).................................................................15

79 Fed. Reg. 43504 (July 25, 2014)..............................................................10

84 Fed. Reg. 19013 (May 3, 2019)................................................................14

85 Fed. Reg. 65241 (Oct. 15, 2020)..............................................................17

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Beetle | American Burying Beetle |
| ESA | Endangered Species Act |
| Service | U.S. Fish and Wildlife Service |

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1291 as an appeal of a final order of the U.S. District Court for the District of Columbia. The District Court had subject matter jurisdiction over the claims set forth in Plaintiff's Complaint pursuant to 28 U.S.C. § 1331, and the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(C) ("ESA" or "Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). The District Court granted summary judgement in Federal Defendants' favor on September 30, 2023. Plaintiff timely appealed the District Court's decision on November 29, 2023.

## STATUTORY AND REGULATORY ADDENDUM

Pertinent statutory provisions are set forth in the Addendum.

## STATEMENT OF ISSUES

This case challenges the decision by the U.S. Fish and Wildlife Service ("Service") to reclassify—or "downlist"—the American bury beetle ("beetle") from "endangered" to "threatened" status despite the Service's own finding that the beetle will likely go extinct in a significant portion of its range in the near future due to climate change. The downlisting was accompanied by another regulation issued by the Service—called a "4(d) rule"—that stripped the beetle of critical protections in the portion of its habitat where it is most vulnerable. The questions presented on appeal are:

1

1. Whether the Service's decision to downlist the American burying beetle from endangered to threatened is contrary to the Act, which defines an endangered species as one "which is in danger of extinction throughout all or a significant portion of its range," when the Service has determined that the species will likely be extinct in a significant portion of its range in as little as 15 years.

2. Whether the 4(d) Rule violates the Act, which requires that 4(d) rules must provide for a species' "conservation," and is otherwise arbitrary and capricious, by eliminating essential protections from ground disturbing activities in the area where the beetle is at most risk from that threat.

## STATEMENT OF THE CASE

### A.    Statutory Context

The Endangered Species Act has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978). To receive any of the Act's substantive protections, a species must first be listed as "endangered" or "threatened" under Section 4 of the Act. 16 U.S.C. § 1533. An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within

the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20). As defined by the Service, the term "foreseeable future" in the definition of "threatened species" means "as far into the future as the Service[] can make reasonably reliable predictions about the threats to the species and the species' responses to those threats." 50 C.F.R. § 424.11(d).

The Act provides the most stringent substantive protections for species listed as endangered. "If a species is listed as endangered, it is entitled to greater legal protections than a species that is listed as threatened." *Ctr. for Biological Diversity v. Everson,* 435 F. Supp. 3d 69, 93 (D.D.C. 2020) (citing 16 U.S.C. § 1538(a)(1) and *Defs. of Wildlife v. Norton*, 239 F. Supp. 2d 9, 13 (D.D.C. 2002)). In addition to receiving a categorical prohibition against unauthorized "take" under Section 9 of the Act, 16 U.S.C. § 1538(a)(1)(B), endangered species generally receive higher priority for the preparation and implementation of recovery plans. *Id.* § 1533(f). The Service is also more likely to determine that particular actions jeopardize the continued existence of endangered species, leading to stronger conservation measures under Section 7(a)(2) of the Act, which prohibits federal agency actions that are likely to jeopardize the continued existence of listed species. *Id*. § 1536(a)(2).

While it explicitly bars the taking of endangered species, the Act does not categorically prohibit the taking of threatened species. However, Section 4(d)—

which is entitled "Protective regulations"—provides that "[w]henever any species is listed as a threatened species … the [Service] shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). "Conservation" is defined by the Act as those "methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," *id.* § 1532(3)—i.e., *recovery* of the species to the point where it may be removed from the list of endangered and threatened species. Section 4(d) also authorizes the Service to extend any or all of the Section 9 take prohibitions, as well as other necessary protective measures, to any threatened species. *See In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 220 (D.D.C. 2011) ("*Polar Bear III*").

The Act requires the Service to make listing determinations "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), and to list species because of any one or a combination of the following statutory factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).

After a species is listed as endangered or threatened, the Act requires the Service to periodically determine whether the listing status should be changed. Hence, Section 4(c)(2) provides that the Service "shall" "conduct, at least once every five years, a review" of all listed species and, as pertinent here, "determine on the basis of such review whether any species should … be changed in status from an endangered species to a threatened species …." *Id.* § 1533(c)(2)(A), (c)(2)(B)(ii). Such 5-year reviews must be based on the same factors that apply to initial listing decisions. *Id*. § 1533(c). The Service also prepares Species Status Assessments. While this document is nowhere mentioned in the Act itself, the Service describes Species Status Assessments as "not a decision document" but, rather, a document "intended [by the Service] to support an in-depth review of the species biology and threats, an evaluation of its biological status, and an assessment of the resources and conditions needed to maintain long-term viability." JA-308.

## B.     Factual Background

### 1.     The Disastrous Decline of the Once-Ubiquitous American Burying Beetle, and the Service's Decision to List the Beetle as "Endangered."

The American burying beetle is the largest member of the North American carrion beetle family, which is an important group of beetles that recycle decaying

materials and contribute to the nutrient cycling essential to functioning ecosystems. JA-600. The beetle was "once ubiquitous" in 35 eastern states in the U.S. and three southeastern Canadian provinces. JA-750, 751; *see also* Species Status Assessment for the American Burying Beetle (2019) ("Status Assessment"), JA-322. However, during the early to mid-20[th] century, as native prairie grasses were converted to crops, pastures, and industrial and urban developments, the beetle vanished from over 90 percent of its range. American Burying Beetle 5-Year Review (2008) ("5-Year Review" or "Review"), JA-723; *also see* JA-151, 153, 156. The Service's biologists and other beetle experts recognized this decline as "one of the most disastrous declines of an insect's range ever to be recorded." American Burying Beetle Recovery Plan (1991), JA-638, 604.

Citing this vast curtailment of the species' historic range and ongoing threats to its existence, the Service listed the beetle as an endangered species in 1989. 54 Fed. Reg. 29652, 29653 (July 13, 1989), JA-751. The Service also based its "endangered" determination on the fact that "there is no known way to reverse any decline that might occur in the known populations" and the vulnerability of any subsequently discovered populations to the same threats that caused the species' drastic decline. *Id*. Thus, at the time of listing, the Service stressed that "it is not improbable that other remnant populations will be discovered in the future," but it determined that this prospect should not foreclose the beetle's listing as

6

endangered because "it is likely that those populations remain vulnerable to the factors that have caused the general decline of the species." *Id*.; *see also id*. ("It is possible that future search efforts may result in discovery of another extant population. However, the extent of the species' decline suggests that any newly discovered populations are also vulnerable to whatever factors have caused their disappearance elsewhere."). The determination of endangered status said nothing about climate change because that was not a known threat to the species at the time.

In 1991, pursuant to Section 4(f) of the ESA, the Service issued a formal Recovery Plan for the beetle. *See* 16 U.S.C. § 1533(f)(1) (providing that the Service "shall develop and implement" recovery plans for listed species). The Recovery Plan pointed to habitat loss and fragmentation and reduced availability of carrion as primary factors in the species' decline. JA-640, 642. The Service determined that large expanses of beetle habitat have been fragmented by agricultural and grazing practices, which increase competition for food sources available to the beetle. JA-640 ("Fragmented habitat not only support[s] fewer or lower densities of indigenous species that historically may have supported *N. americanus* populations, but there is a great deal more competition for those limited resources among the 'new' predator/scavenger community.").

**2.    The Service's 5-Year Review Determining that the Beetle's Endangered Status Should Be Retained Notwithstanding the Discovery of New Populations.**

In 2008, as required by Section 4(c) of the ESA, the Service reevaluated whether the beetle's endangered status should be changed. 16 U.S.C. § 1533(c)(2). The Service's 5-Year Review set forth a detailed account of the current status of the beetle and whether the beetle should retain its endangered status in light of the Act's listing factors. The Review explained that, as had been anticipated at the time of listing, more intensive surveys had found some additional extant populations. JA-701, 708, 710. However, also consistent with the prior listing decision, the 5-Year Review determined that the beetle should retain its endangered status because "[e]ven with the discovery of additional [beetle] populations, the species remains extirpated from about 90 percent of its historic range" and continues to face myriad threats from "habitat modification and fragmentation, vertebrate competition, [and] loss of ideal carrion." JA-723, 732. The Service determined that "threats to the species have not been abated sufficiently to show that the [beetle] is no longer in danger of extinction," JA-732, and, in particular, that "range curtailment" of nearly all the beetle's former habitat—a "primary reason for the original listing"—continued to warrant "endangered" status. JA-727.

Applying the five statutory listing factors, the 5-Year Review specifically found that Listing Factor A—the "present or threatened destruction, modification, or

8

curtailment of [the beetle's] habitat or range"—continued to support endangered status because, "[s]ince listing, the body of scientific literature confirming the adverse effects of habitat modification and fragmentation of burying beetle abundance, diversity, and success has been growing." JA-723. The Review identified a plethora of ongoing threats to beetle habitat and concluded that "[o]verall, the habitat-related factors under Factor A continue to affect the species within its current range." JA-727.

Following this comprehensive review of the species' status, the Service concluded:

> [b]ased on information available at this time, we find that the [beetle] *remains endangered throughout its current range and thus meets the ESA definition of endangered*, i.e., a species that is in danger of extinction throughout all or a significant portion of its range.

JA-732 (emphasis added).

Further, the Review identified an emerging threat—climate change—that, particularly in the Southern Plains portion of the range, was projected to exacerbate threats to the beetle by raising ground soil temperatures, increasing the frequency of extreme weather events such as drought, and expanding the range of exotic fire ants, a new competitor for carrion. JA-730, 731 (disease and climate change "pose risks" to the beetle "irrespective of land protection measures").

9

### 3.      The Petition to Delist and the Service's Species Status Assessment

As a result of its endangered listing, the beetle benefited from ESA

protections that have helped the species stave off immediate extinction from

various industrial activities. Of particular relevance, in 2014, pursuant to Section

10 of the ESA—which provides for the issuance of "incidental take" permits so

long as private parties commit to measures to minimize and mitigate the adverse

effects of their actions, *see* 16 U.S.C. § 1539(a)(1)(B)—the Service approved an

"Oil and Gas Industry Conservation Plan Associated with Issuance of [ESA]

Section 10(a)(1)(B) Permits for the American Burying Beetle in Oklahoma." 79

Fed. Reg. 43504 (July 25, 2014), JA-168. The plan and associated permit required

"measures necessary to minimize and mitigate impacts [of take] to the maximum

extent practicable." *Id*. The plan resulted in protection of a number of areas for the

beetle in Oklahoma as mitigation for loss of habitat elsewhere to development.

However, in 2015, several organizations—led by the Independent Petroleum

Association of America, which represents the oil and gas industry—formally

petitioned the Service to delist the beetle. JA-257. The petitioners asserted that the

discovery of new populations since listing and the purported absence of ongoing

threats meant that it was an "error" to afford the beetle any ESA protection. JA-

322.

10

In response to the petition, the Service prepared a Status Assessment in 2019. The Status Assessment identified three distinct geographical areas with populations of American burying beetle: the Southern Plains, Northern Plains, and New England analysis areas. Within these larger analysis areas, the Service further delineated smaller analysis areas. As shown on the map below, the Southern Plains area includes the Red River analysis area, the Arkansas River analysis area, and the Flint Hills analysis area. JA-309. The Northern Plains area includes the Loess Canyons, Sandhills, and Niobrara River. *Id.* The New England analysis area includes Block Island off the coast of Rhode Island, and a reintroduced population on Nantucket Island off the coast of Massachusetts, both of which are artificially supplemented with carrion to ensure survival. *Id.;* JA-269; JA-416.

11



JA-309.

The Status Assessment again found that, notwithstanding the discovery of some additional populations since the species' listing as endangered, the beetle "has disappeared from over 90 percent of its historical range." JA-322. The Status Assessment also again documented ongoing habitat loss and fragmentation in the Southern and Northern Plains, JA-382–383, and attributed the species' drastic decline to agriculture, grazing, logging, fire suppression, wind energy development, and urban development, JA-343-344. Further, the Status Assessment documented that the harm from climate change predicted in the 5-Year Review now poses an existential threat to the species, particularly in the Southern Plains. JA-312.

Ominously, the Status Assessment confirmed that climate change is *already* harming the beetle in the Southern Plains analysis area. JA-473. The Status Assessment found that increases in ambient air temperatures, prolonged droughts, increased evaporation, and changes in precipitation—all attributed to climate change—are occurring in real time, and that they stress and kill American burying beetles, reduce reproductive success, increase competition for available carrion, and overwhelm beetles' ability to preserve carrion. JA-361, 362, 465, 468. Further, high air temperatures ranging from 85-90°F are known to "kill or sterilize" captive beetle colonies, meaning that once the ambient air temperature reaches these thresholds, beetles can no longer survive. JA-361.

The Status Assessment concluded that as soon as 2039—i.e., in as few as 15 years from now—due to these ongoing impacts, American burying beetles "in all southern analysis areas would likely be extirpated and this is a loss of about 59% of the current range." JA-486. According to the Status Assessment, the species is already at or near its temperature and moisture-related limits at the southern and western edges of this analysis area; hence, the species is likely *already* extirpated from Texas and Arkansas due to climate change, as no burying beetles have been

found despite extensive survey efforts since 2008. JA-470, 471, 473.[1]

### 4. The Service's Proposed Downlisting and Accompanying 4(d) Rule Stripping the Beetle of Vital Safeguards in the Southern Plains Portion of its Range.

Notwithstanding the findings in the Status Assessment that the Southern Plains analysis area faces the prospect of complete extinction due to climate change in less than two decades, that climate change has already extirpated the beetle in portions of its range, and that other threats that led to the species' endangered listing are ongoing, the Service proceeded with publication of a proposed downlisting rule in May 2019 ("Proposed Rule"). 84 Fed. Reg. 19013 (May 3, 2019), JA-101. The Service's principal rationale for relegating the beetle to this less protective status despite the emergence of a new existential threat since the species was listed as endangered was that "[s]ince the time of listing, numerous searches and surveys have resulted in the discovery of additional American burying beetle occurrences," JA-112—just as the Service itself had anticipated when it listed the beetle as endangered in 1989. *See supra* at 8. Although the

---

[1] Although the Status Assessment paints a dire picture of the species' prospects for survival and recovery, particularly from climate change, outside beetle experts criticized the Status Assessment process for downplaying other threats. For example, Dr. Douglas Leasure, who was asked by the Service to assess the threat that agriculture posed to the beetle, opined that in compiling the Status Assessment, the agency had disregarded both his views and those of another expert, Dr. Wyatt Hobeck, concerning the seriousness of the threat posed by agricultural conversion. JA-748.

Service acknowledged that the 2008 5-Year Review had "recommended that this species remain classified as endangered," JA-102, the Proposed Rule did not identify any beetle populations that had been discovered since that time.

While conceding that climate change has already extirpated the beetle in portions of the Southern Plains and that the remainder of this area faces imminent extinction, JA-106, 110, the Proposed Rule failed to address whether the beetle is "in danger of extinction throughout … *a significant portion of its range*" within the meaning of the ESA's definition of an endangered species, 16 U.S.C. § 1532(6) (emphasis added). This is because (as explained in the Proposed Rule), at the time the Proposed Rule was issued, the Service had in effect a policy providing that the Service "should first consider whether the species warrants listing 'throughout all' of its range and proceed to conduct a 'significant portion of its range' analysis if, and only if, a species does not qualify for listing as either an endangered or threatened species according to the 'throughout all' language." JA-112. Hence, because the Service proposed to "reclassify the American burying beetle as a threatened species across its entire range," it did not undertake *any* analysis of whether any "significant portions" of the range qualified as endangered. *Id*.; *see also* Final Policy on Interpretation of the Phrase "Significant Portion of Its Range," 79 Fed. Reg. 37578 (July 1, 2014).

Along with downlisting to threatened status, the Service proposed a 4(d) Rule that would eliminate key legal safeguards for the beetle in the most vulnerable portion of its range. Stating that "[u]nder section 4(d) of the Act, the Service has discretion to issue regulations that we find necessary and advisable to provide for the conservation of threatened species," the agency proposed that in two of the three analysis areas—New England and Northern Plains—incidental take would continue to be "prohibited in suitable habitat when the take is the result of soil disturbance." JA-113. Thus, in those areas, entities wishing to engage in ground-disturbing activities that kill or otherwise take beetles would still have to obtain authorization from the Service by committing to conservation measures for the beetle. Yet the Service proposed, with minor exceptions, to eliminate the prohibition on incidental take in the Southern Plains, where the beetle is most at risk from near-term extinction and where habitat destruction and fragmentation from soil disturbing activities such as oil and gas development continue to threaten American burying beetles. *Id.*[2]

Despite strenuous opposition from beetle scientists, JA-258; JA-267, 270; JA-256; JA-271, 272, as well the Nebraska Game and Parks Commission, JA-261–

---

[2] With regard to certain narrowly "defined conservation lands"—i.e., several public land areas, including two military installations—the Service proposed to exempt incidental take "if it occurs in compliance with a Service-approved management plan …." JA-114.

264, the Service published the final Downlisting and 4(d) Rules in October 2020 ("Final Rule"). 85 Fed. Reg. 65241 (Oct. 15, 2020), JA-118. In adopting the Final Rule, the Service again acknowledged the "disappearance of American burying beetles from 90 percent of their historical range," JA-124, and that climate change—a threat not even on the Service's radar when the beetle was listed as endangered—now poses an "existential risk" to the entire Southern Plains part of the species' range. *Id*. The Service also conceded that reintroduction efforts have failed to produce even a single "self-sustaining" population three decades after listing. JA-128. Yet the Service determined that this dire state of affairs did not warrant retaining the species' endangered status.

When finalizing the beetle's downlisting to threatened status, the Service fundamentally shifted its approach to analyzing whether the species is endangered in a "significant portion" of its range. As the Service explained in issuing the Final Rule, *see* JA-132, following publication of the Proposed Rule, Judge Sullivan of the District Court vacated, as contrary to the plain language of the ESA, the portion of the Service's "significant portion of its range" policy that precluded the agency from considering endangered status in a portion of a species' range if the species was found to be threatened throughout its entire range. *See Everson,* 435 F. Supp. 3d at 89. Consequently, when adopting the Final Rule, the Service made a finding *for the first time*—i.e., with no advance public notice or comment—as to whether

17

the beetle's status in the Southern Plains portion of its range warrants listing as endangered. *See id.* ("Following the court's holding [in *Everson*], we *now* consider whether there are any significant portions of the species' range where the species is in danger of extinction.") (emphasis added).

In doing so, the Service found that, due to climate change alone, "populations in the Southern Plains and 59 percent of the existing range of the species are projected to be lost within the mid-century time period"—which the Service described as occurring as soon as 2039. JA-127. The Service further found that, in addition to the ongoing destruction and fragmentation of habitat from various causes, the "Southern Plains analysis areas are *currently* experiencing the effects of climate change," JA-133 (emphasis added), as burying beetles are no longer found anywhere in Texas or Arkansas where temperatures are at or past thresholds where the beetle cannot survive. JA-125. But because the bulk of the predicted climate change effects have not *yet* occurred, the Service declared that the beetle "is not in danger of extinction," and hence can no longer be considered endangered in the Southern Plains as well as the rest of the range. *Id.* Based on that conclusion, the agency did not even consider whether the nearly 60 percent of the species' range in the Southern Plains qualifies as a "significant portion of its range" for purposes of an endangered listing. *Id*.

18

**C.    Proceedings Below**

To protect the American burying ⁱbeetle from extinction, the Center filed this case in March 2021, JA-6–28, challenging the Service's reclassification of the beetle as contrary to the plain language of the ESA and otherwise arbitrary and capricious. The Center also challenged the Service's 4(d) Rule for failing to provide for the conservation of the species as required under the ESA, and for failing to adequately explain its decision to remove protections to the most at-risk population of beetles.[3]

In September 2023, the district court granted summary judgment in favor of the Service. JA-42–98. In upholding the Service's determination, the district court, applying the since-overruled *Chevron* framework, found that the Service's interpretation of the definitions of "threatened" and "endangered" and its application of those definitions to the beetle's status was entitled to deference. JA-68. The Court also upheld the Service's 4(d) Rule. JA-90–91.[4]

---

[3] To establish standing, the Center submitted declarations from members asserting various concrete interests in the survival and recovery of the beetle. *See* JA-31–34, JA-35–38. Defendants did not challenge standing below.

[4] The Center raised several additional arguments below that it is not pressing on appeal.

## SUMMARY OF ARGUMENT

1.  The Service's reclassification of the beetle from endangered to threatened status contravenes the plain language of the ESA and is otherwise arbitrary and capricious. The ESA's definition of an "endangered" species is one that "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The definition of a "threatened" species is one that "is likely to become an endangered species throughout all or a significant portion of its range within the foreseeable future." *Id*.

Here, the Service has concluded that the entire Southern Plains population of American burying beetle, comprising nearly 60% of the species' current range, will likely be extinct due to climate change as soon as 15 years from now, and that this extinction event is already taking place in portions of the Southern Plains.  The Service's determination that the beetle is not endangered despite finding that the beetle will be *extinct* in a significant portion of its range in the very near future is contrary to the plain language of the ESA, counterintuitive, and otherwise arbitrary and capricious.

2.  The Service's 4(d) Rule fails to "provide for the conservation" of the beetle as required by the ESA, 16 U.S.C. § 1533(d), and is arbitrary and capricious. Far from conserving the beetle, the 4(d) Rule removes vital protections in the very portion of the species' range most at risk of imminent extinction. In effect, the rule

authorizes the oil and gas industry and others to destroy beetle habitat in the

Southern Plains without adopting any protective measures at all, and without

explaining how affording the beetle *least* protection in the portion of the

species' range where, according to the Service itself, the beetle is *most* imperiled

"provide[s] for the conservation" of the beetle. *Id*.

## ARGUMENT

## I.     Standard of Review

The Court reviews the district court's ruling on summary judgement de

novo. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008). The

Service's listing determination is subject to review under the APA and must be set

aside if the Court determines it is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts

arbitrarily and capriciously if it "has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In determining whether the agency has acted "in accordance with law," 5

U.S.C. § 706(2)(A), the Court "must exercise [its] independent judgment in

deciding whether [FWS] has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 219 L. Ed. 2d 832, 867 (2024); *id.* at 842 (describing the "command of the APA that 'the reviewing court'—not the agency whose action it reviews—is to decide *all* relevant questions of law' and 'interpret … statutory provisions'") (quoting 5 U.S.C. § 706).

**II.    The Service's determination that the American burying beetle is not endangered in a significant portion of its range is contrary to the plain language of the ESA and arbitrary and capricious.**

The Act defines an "endangered species" as "any species which is in danger of extinction throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6) (emphasis added). Accordingly, a species must be listed as endangered *either* because it is in danger of extinction "throughout all" of its range "or" because it is in danger of extinction in a "significant portion of its range." *Id.* Moreover, as the Service conceded in the Final Rule, a finding that a species is *threatened* throughout the entirety of its range does not excuse the Service from determining whether a specific portion faces such severe threats that an *endangered* determination is warranted. *See also Everson*, 435 F. Supp. 3d at 92. As these principles are applied to the beetle, the agency's determination that the beetle is not endangered in a "significant portion" of its range cannot be reconciled with the Service's own factual findings or the plain language of the Act.

In its Status Assessment, the Service found that the beetle is currently experiencing an extinction event in the Southern Plains analysis area that will likely result in the extirpation of the species as soon as 2039. JA-483; JA-128; JA-486. The Service determined that the Southern Plains portion of the beetle's range, which comprises nearly 60% of its current overall range, faces an "existential" threat of climate change that is already causing a drastic reduction in the species' available habitat, in addition to finding "many of the same threats" that threaten the beetle throughout its entire range. *See* JA-133 (explaining that beetles in the Southern Plains are also harmed by "'[u]rban and suburban development, land use change, decreased carrion availability, and competition with other scavengers"). The Service concluded that the threat of climate change is so severe that it will render the Southern Plains completely uninhabitable as early as 2039, resulting in an extirpation of the species. JA-470; JA-128; JA-486.

Nonetheless, the Service reached the counterintuitive conclusion that the beetle should no longer be listed as endangered. In doing so, the agency contravened the plain language of the Act's definitions of endangered and threatened species and failed to clearly (or even coherently) delineate between the categories. In addition, the decision to downlist flies in the face of the purposes of the Act in view of the Service's conclusion that the species will likely be extinct in the entire Southern Plains portion of its range in the foreseeable future.

A.    **The American burying beetle is currently experiencing an extinction event in the Southern Plains and will be extirpated as soon as 15 years from now.**

For the purposes of this appeal, it is undisputed that, due to increased temperatures associated with climate change, beetle populations in the Southern Plains analysis area are at risk of being entirely lost as soon as 2039—only 15 years from now—and that beetle populations are already being extirpated in the area by elevated temperatures the species cannot tolerate. JA-486, 470; JA-132. The Service's own analysis in the Status Assessment disclosed that under the high emissions scenario, which most closely models current rates of climate change, JA-483, "[most] of the Southern Plains analysis areas will be near or exceed threshold temperatures by 2039, with the potential to extirpate [the beetle] from most or all Southern Plains populations." JA-470. In each of the Southern Plains areas analyzed, the Service determined that the species' future resiliency—the ability to recover from catastrophic events and grow in size, JA-318—is *zero*, JA-474, meaning that, based on the best available science, the likelihood of the American burying beetle surviving in the Southern Plains beyond 2039 or soon thereafter is non-existent. *Id*. "By 2040-2069, [the beetle] in all southern analysis areas would likely be extirpated and this is a loss of about 59% of the current range." JA-486.

The absence of positive survey results in Texas and Arkansas is evidence of this extinction event happening in real time due to high temperatures caused by

24

climate change. JA-465. The Service's own Status Assessment establishes that climate change is *currently* causing the extirpation of the beetle in the Southern Plains analysis area and that in view of these present and ongoing effects, "a majority of the Southern Plains analysis area will be near or exceed threshold temperatures by 2039, with potential to extirpate most or all Southern Plains populations." JA-470.

More specifically, in the Red River Analysis Area, the Service concluded that under both climate change scenarios, all habitats will likely be unsuitable by the end of 2039 and that "those effects may already be occurring." JA-473–474. The Service found that the beetle is already extirpated from parts of this analysis area in Texas and parts of Arkansas because the southern and western edge of its range may already be at or near the beetle's temperature limits. JA-470, 471, 473. In the Arkansas River and the Flint Hills analysis area, "climate change is predicted to make all habitats in this analysis area at or near the presumed threshold (mean maximum air temperatures of 95° F) for being unsuitable by 2039." JA-474, 475. Hence, "with climate change, a major decline in abundance in most or all of this area is expected by 2039." JA-475.

As further explained below, the Service's own finding that the American burying beetle may well be extinct or close to extinction in the Southern Plains portion of its range in less than two decades meets the Act's plain language

25

definition of "endangered." At the very least, the agency has failed to rationally

explain why this set of circumstances does not satisfy the statutory definition and,

instead, warrants *downgrading* the species' prior endangered status to threatened.

Because of the Service's unlawful and arbitrary determination that the beetle

is no longer endangered in the Southern Plains despite the existential threat of

climate change, the agency avoided even analyzing whether the Southern Plains

constitutes a "significant portion" of the species' range. *See supra* at 19-20.

However, since the Southern Plains accounts for more than half of the species'

remaining range, JA-486; JA-136; *see also* JA-138 (map of analysis areas), and the

Service has also found that beetles in the other portions of the range are either at

"risk of extinction … in the future" (the Northern Plains) or require "ongoing

active management" just to survive (New England), JA-133, the conclusion seems

inescapable that the Southern Plains constitute a "significant portion" of the

beetle's range. At minimum, this issue must be remanded to the Service for further

analysis and an opportunity for public comment.

**B.     The Service's approach requires the Court to rewrite the plain
language of the ESA's definitions of "endangered" and
"threatened."**

Given the Service's own factual findings regarding the status of the beetle in

the Southern Plains, the plain language of the Act compels the conclusion that the

species is endangered in that portion of its range. The Service's finding that,

because of climate change, the beetle is already losing habitat in the Southern Plains and is destined for total extinction in the area as soon as 15 years from now, JA-476, 465; JA-132, means that, under any reasonable reading of the definition of "endangered," the beetle is now "*in danger of* extinction" in this portion of the range. 16 U.S.C. § 1532(6) (emphasis added); *see also Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,* 601 U.S. 42, 59 (2024) ("When Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'") (quoting *Sturgeon v. Frost,* 587 U.S. 28, 56 (2019)); *BP P.L.C. v. Mayor of Balt.*, 593 U.S. 230, 246 (2021) (explaining that a reviewing court's "task is to discern and apply the law's plain meaning as faithfully as we can").

Yet the Service found this extinction scenario does not qualify as being "in danger of extinction" because most of the "impacts from climate change that are likely to put the species at risk of extinction *will occur in the future*." JA-132 (emphasis added). But the mere fact that the predicted extinction will occur in the future cannot be the basis for rejecting an endangered finding. That is because the statutory definition itself is future-oriented; again, it refers to a species that is "in danger of" extinction, not a species that is going extinct *at this very moment* (although even that is arguably the case here, given that climate change is already in the process of driving the beetle to total extirpation in the Southern Plains). Unless a total extinction event is literally occurring at the very instant the Service

27

is making its decision, *every* anticipated loss of a species will occur at some time "in the future."

Accordingly, the Service's approach not only rewrites the language of the statutory definition, but also leads to absurd results. Under the Service's approach, for example, if the beetle's entire remaining habitat would be lost to a dam in the foreseeable future, *see, e.g., Tenn. Valley Auth.,* 437 U.S. at 184, it could not be considered "endangered" because the fatal blow would be dealt at some point "in the future." There is little functional difference between that scenario and the one confronting the beetle in the Southern Plains; if anything, the case for endangered status is even more compelling here because the beetle is *presently* being harmed by the very same threat that is expected to cause its complete extirpation within a short time.

Moreover, the Service's approach to the plight of the beetle also cannot be reconciled with the plain language definition of "threatened." The Service determined that the beetle qualifies only as threatened in the Southern Plains because, "[w]ithin the foreseeable future, *i.e.,* the mid-century time period (2040-2069), all Southern Plains analysis areas are expected to exceed threshold temperatures … likely resulting in *extirpation of the American burying beetle from these areas*." JA-133 (emphasis added). But the statutory definition of "threatened" encompasses species that will become "*endangered* … within the foreseeable

28

future throughout all *or a significant portion of its range*," 16 U.S.C. § 1532(20) (emphasis added), not a species that will be *entirely lost* within the foreseeable future—as the Service has found will occur here. Simply put, if the plain meaning of the statutory definitions is applied to the Service's own factual findings, the American burying beetle is not likely to become an *endangered* species in the Southern Plains analysis area within the foreseeable future; instead, it is likely to become an *extinct* species in that portion of the range in the foreseeable (and very near) future. This necessarily means the species is endangered *now*.

To sustain the Service's position, therefore, the Court must, in effect, rewrite the definition of threatened from "likely to become *endangered* in the foreseeable future," 16 U.S.C. § 1532(20), to "likely to become *extinct* in the foreseeable future" within a significant portion of the beetle's range. That is something the Court should be loath to do. *See Patel v. Garland*, 596 U.S. 328, 340 (2022) (rejecting statutory construction arguments that "read like elaborate efforts to avoid the most natural meaning of the [statutory] text").

Indeed, the Supreme Court has recently reaffirmed that "it will deviate from a statutory definition only when applying the definition would be 'incompatible with Congress's regulatory scheme' or would 'destro[y] one of the statute's main purposes.'" *Dep't of Agric. Rural Dev.*, 601 U.S. at 60 (quoting *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 163-64 (2018)). That is hardly the case here. To the

29

contrary, abiding by the statutory definitions is fully consistent with the Act's "policy" of "institutionalized caution" in dealing with highly imperiled species. *Tenn. Valley Auth.*, 437 U.S. at 194. Accordingly, the Service's determination regarding the beetle's status in the Southern Plains cannot be sustained. An approach that necessitates rewriting the ordinary meaning of both the endangered and threatened definitions is arbitrary and capricious and not "in accordance with law." *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 678 (2020) (explaining that "[i]t is not for [the Court] to rewrite the statute so that it covers only what [a party] thinks is necessary to achieve what [it] thinks Congress really intended").

### C.    The Service Has Set Forth No Coherent Explanation for Why the Beetle's Status in the Southern Plains Does Not Qualify as Endangered.

In deferring to the Service's downlisting decision, the district court, applying *Chevron*, held that it was "permissible" for the Service to define an endangered species as one that is "on the brink of" extinction and that this was sufficient to sustain the agency's position here. JA-75–76 (citing *In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig.*, 748 F. Supp. 2d 19, 89 (D.D.C. 2010) ("*Polar Bear I*")). However, even aside from the overruling of *Chevron*, there are multiple problems with the Service's approach.

First, as previously explained, the Service's reformulation contravenes the language of the statutory definitions that make plain that a species likely to be *eliminated* from a significant portion of its range within the "foreseeable future" is endangered rather than threatened. Accordingly, at least as applied to the beetle, the Service's approach is not even a "permissible" interpretation of the statute, let alone the "best reading" of the ESA. *Loper Bright*, 219 L. Ed. 2d at 856.

Second, even if the Court were to allow the substitution of "on the brink of extinction" for "in danger of extinction," the Service has failed to explain why the predicted loss of the entire Southern Plains' portion of the range as soon as 2039 does not qualify as "on the brink," especially when the species is already experiencing extirpation and the reduction of its range in real time. JA-465. The Service has provided no indication as to where it draws the line. If potential extinction in less than two decades does not qualify as "on the brink," what about one decade, or five years? Or is the answer entirely dependent on whatever conclusion the agency desires to reach in a particular situation? That is the essence of arbitrary and capricious decision making to which the Court should not have deferred even under the most deferential of standards.

Moreover, contrary to the ruling below, the situation here stands in sharp contrast to that addressed in *Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act Listing)*, 794 F. Supp. 2d 65 (D.D.C. 2011) ("*Polar*

*Bear II*"), in which the district court (applying *Chevron*) upheld the listing of the polar bear as threatened. In that case, the Service found that the polar bear was threatened rather than endangered because there was "no information in the Administrative Record to suggest that the species has experienced significant population declines or severe restrictions in its range such that it is currently on the brink of extinction or that it faced a sudden and calamitous threat." *Id*. at 84. The Service also expressly declined to prescribe any generally applicable definition of "endangered," *id.* at 82, but instead said that it "does 'not necessarily mean that extinction is certain or inevitable; rather, whether a species is currently on the brink of extinction depends on the life history and ecology of the species, the nature of the threats, and the species' response to those threats.'" *Id.* at 83. Recognizing that the "decision to list a species as threatened or endangered is highly fact-specific," the district court upheld the threatened listing while noting that "preliminary" studies showing polar bears at risk in certain ecoregions within *75 years* "give the Court pause." *Id*. at 73 n.28. Here, the beetle *has* already suffered "severe restrictions in its range" in the Southern Plains; it *is* already facing a "calamitous threat" in the Southern Plains; and the analyses relied on in the

Species Status Assessment predicting complete loss of that portion of the range in as few as 17 years are not "preliminary."[5]

At minimum, therefore, the Service has failed to set forth a reasonable explanation as to why the species' predicted extinction in the Southern Plains in as soon as two decades or less does not meet the agency's own interpretation of "endangered."

## III. The 4(d) Rule violates the ESA because it fails to provide for the conservation of the American burying beetle and arbitrarily eliminates essential protections in the Southern Plains portion of the range.[6]

Unlike endangered species, threatened species are not categorically protected from take under the Act. However, Section 4(d)—which is entitled "Protective regulations"—provides that "[w]henever any species is listed as a threatened species … the [Service] shall issue such regulations as [it] deems

_____

[5] It is also noteworthy that, in the polar bear case, while declining to prescribe any generally applicable definition of "endangered," the Service set forth four "categories" purporting to summarize when species had been listed as endangered in the past. *Polar Bear II*, 794 F. Supp. 2d at 83. Since the beetle is one of the species that *was* listed as endangered at the time the Service set forth these categories based on its prior listing decisions, it is unsurprising that the beetle falls squarely within several, if not all, of these categories— including that it is a species that, in the Southern Plains, has suffered "major reductions in numbers, range, or both, as a result of persistent threats," and that "it is "facing a catastrophic threat from which the risk of extinction is imminent and certain." *Id*.

[6] If the Court reverses the district court's determination regarding the Downlisting Rule and reinstates the endangered listing, there is no need for the Court to address the legality of the 4(d) Rule.

necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). "Conservation" is defined by the Act as those "methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," *id.* § 1532(3), i.e., *recovery* of the species to the point where it may be removed from the list of endangered and threatened species. Section 4(d) also authorizes the Service to extend the Section 9 take prohibitions, as well as other necessary protective measures, to any threatened species. *See Polar Bear III*, 818 F. Supp. 2d at 220.

The 4(d) Rule adopted for the beetle does not satisfy the statutory "conservation" standard and is otherwise arbitrary and capricious. In particular, the 4(d) Rule arbitrarily omits any protection against incidental take from soil disturbing activities in the vast majority of the Southern Plains—the area where the beetle is most at risk from habitat destruction from oil and gas operations and climate change—while maintaining such protections in the Northern Plains. On the record here, the Service's application of different incidental take prohibitions for the Northern Plains and the Southern Plains analysis areas has nothing whatsoever to do with recovering the beetle. In effect, the rule authorizes the oil and gas industry—which formally petitioned the Service to delist the beetle— and others to destroy beetle habitat in the Southern Plains without adopting any protective

measures at all. At minimum, the rule is arbitrary and capricious because, while essentially the same threats to the beetle from soil disturbing activities exist in both analysis areas, they are treated dramatically differently.

Thus, for beetles found in the Northern Plains as well as New England, the 4(d) Rule prohibits incidental take of beetles from soil-disturbing activities in suitable American burying beetle habitat subject to authorization from the Service, i.e., through incidental take permits or otherwise. JA-137.[7] But for beetles found in the Southern Plains, incidental take is prohibited only in certain narrowly defined "conservation lands." *Id.* These include only one location in Arkansas (Fort Chaffee) and two locations in Oklahoma (McAlester Army Ammunition Plant and Camp Gruber/Cherokee Wildlife Management Area). *Id.* Since these are public lands where the beetle is *already* protected from such land-disturbing activities as oil and gas development, timber cutting, and agricultural conversion, extending the ESA's take prohibition to them serves little purpose.

---

[7] In addition to the issuance of incidental take permits through Section 10 of the ESA, an activity with a federal nexus—e.g., an activity that requires a federal permit or license or is federally funded—may obtain incidental take authorization through a consultation process established by Section 7 of the ESA, so long as the Service determines that the activity will not jeopardize the continued existence of the species and prescribes measures for minimizing the impact of the taking on the species. *See* 16 U.S.C. §§ 1536(a)(2), (b)(4).

On the other hand, in every other location in the Southern Plains where conditioning incidental take on conservation efforts for the beetle *would* make an important difference—i.e., the overwhelming majority of the species' habitat—there are no longer any restrictions whatsoever on the nature or extent of incidental take that may occur. *Id.* Hence, the very activities that are contributing to the beetles' demise—including oil and gas development, agricultural conversion, and alteration of forested habitats in areas occupied by beetles—may now occur without any measures being undertaken to minimize or mitigate their impacts on beetles. These are measures which, until now, have allowed the beetle to survive. JA-724. The Service also disclosed that oil and gas activity is "locally high in portions of [the Southern Plains] analysis area." JA-374.[8] Therefore, the decision not to extend protections against take from the primary threats in the Southern Plains populations contravenes the "conservation" mandate in Section 4(d) because in no way will the rule help the beetle recover to the point at which protection under the Act is no longer necessary. 16 U.S.C. § 1532(3).

---

[8] Conversely, the Status Assessment indicated that habitat loss from soil disturbing activities is not a primary threat to beetles in the Northern Plains. Instead, the Service disclosed that expansion of invasive woody vegetation is a primary cause for habitat loss and specifically noted that oil and gas development is not a risk factor in the Northern Plains. JA-377, 380, 381.

Moreover, insofar as the fate of the beetle is concerned, there is no rational reason for continuing to apply protections against take in the Northern Plains while largely dispensing with them in the Southern Plains. If anything, the need for safeguards in the Southern Plains is demonstrably greater. As explained, not only are the overall threats to beetles greater in the Southern Plains, but the majority of suitable American burying beetle habitat in the Oklahoma part of the Southern Plains is privately owned. JA-724. A large amount of this habitat is owned by Weyerhaeuser, where mature forest habitats that once supported the American burying beetle have been steadily reduced by logging, a soil disturbing activity. *Id.* In its 5-Year Review, the Service determined that this alteration of forest habitat "is likely to have contributed to the decline of the area's [beetle] population." *Id.* The Service further disclosed that "thousands of acres of [American burying beetle] habitat are affected by pipelines, access roads, drill pads, and other facilities associated with petroleum and natural gas drilling, development, and transportation"— soil disturbing activities that now may proceed in the absence of any safeguards. JA-724.

The district court determined that the Service found that the "current absolute risk" of soil disturbing activities is low. JA-92–93. However, this determination contradicts the Service's findings in its Status Assessment, which confirmed that, outside of climate change, the primary threat to beetles in the

Southern Plains analysis area is habitat loss from soil disturbing activities,
including intensive agricultural land use and commercial forestry (i.e., logging).
JA-372 ("Current risk factors include habitat loss and alteration due to intensive
agricultural land uses, commercial forestry, and some areas of urban
development."); *see also* JA-374, 375. The Service disclosed that the reason large
swaths of potential habitat for the American burying beetle are no longer
considered "favorable" in the Southern Plains is due to "intensively managed pine
plantations and forested areas" and grassland/pasture lands used for grazing and
hay productions. JA-374, 375. The Service also disclosed that oil and gas activity
is "locally high in portions of [the Southern Plains] analysis area." JA-374. Along
with climate change, therefore, soil disturbing activities are major threats to the
beetle in the Southern Plains. JA-372, 374, 375.

In short, the record reflects that the beetle is just as, if not more, harmed by
soil-disturbing activities in the Southern Plains as in the Northern Plains due to the
amplified effect from climate change and threats from oil and gas development,
among other activities. Yet the Service's 4(d) Rule gives a green light to
unrestricted take throughout the vast majority of the Southern Plains, where the
beetle is most endangered. This can only undermine the survival of the beetle and
impede any prospect for its recovery. Accordingly, the 4(d) Rule as applied to the
Southern Plains is the opposite of a "conservation" or "protective" regulation

within the meaning of ESA Section 4(d), 16 U.S.C. § 1533(d); *cf. Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir, 2008) (holding that a Service recommendation that had "no effect whatsoever" and amounted to "total inaction" regarding efforts to recover the key deer did not qualify as a "conservation" program within the meaning of section 7(a)(1) of the ESA). And by irrationally treating the Northern and Southern Plains completely differently although soil-disturbing activities threaten the beetle in both areas, the 4(d) Rule "runs counter to the evidence before the agency" and is arbitrary and capricious for that reason as well. *State Farm*, 463 U.S. at 63.

Further, the Service's only explanation for the near-total elimination of take protections in the Southern Plains is woefully deficient. The final rule says that "[o]utside of defined conservation lands, incidental take is not prohibited because the Southern Plains currently has low risks to the species associated with land development," and the "combined permanent loss of habitat due to urban and agricultural expansion is less than 2 percent." JA-135. The district court relied on this explanation to find that the 4(d) Rule adequately conserves the species. However, the explanation makes no sense for multiple reasons.

First, by definition, there is little or no "land development" *within* the "conservation lands" protected by the 4(d) Rule. There is no evidence in the record that preexisting "conservation lands" required further safeguards for beetles to be

adequately protected. On the other hand, there are *no* safeguards in place for beetles on the *other lands* excluded from the 4(d) Rule. Consequently, if the potential for harmful land development was, in fact, the dispositive consideration, as the Service asserted, the 4(d) Rule would do the reverse of what it accomplishes: it would *exclude* "conservation lands" from the take prohibition as unnecessary while extending take protections to areas where the beetle is, in fact, at considerable risk.

Second, the Service's reference to the "permanent loss of habitat projected due to urban and agricultural expansion," JA-135, conspicuously excludes oil and gas operations. The 5-Year Review specifically found that such operations have been harmful to the beetle and noted that Oklahoma is the third largest gas-producing State in the nation, with "thousands of acres of habitat [] affected by pipelines, access roads, drill pads, and other facilities associated with petroleum and natural gas [activities]." JA-724. The Service noted that the prohibition on take has previously been used to trigger important habitat protection measures by the oil and gas industry as a condition for operating in beetle habitat. *Id.* Conspicuous by its absence, therefore, is an explanation for the exclusion in the 4(d) Rule of oil and gas operations in the Southern Plains.

Third, the Status Assessment states that habitat loss in *both* the Southern and Northern Plains is a major risk factor for the species. JA-342. The Service stated

that "[t]here is little doubt that habitat loss and alteration affect this species at local or even regional levels, and could account for the extirpation of populations once they become isolated from others." *Id.* Further, beetles in the Southern Plains are at *greater* risk from agricultural activities like grazing then beetles in the Northern Plains. JA-344 (noting that grazing in Northern Plains "does not have the same negative effect on [beetle] numbers or presence" as grazing in the Southern Plains).

Finally, even with respect to the loss of habitat "projected due to urban and agricultural expansion," JA-135, the Service does not explain why a "permanent loss" of 2% of the remaining habitat—for a species that has already lost 90% of its historic range—is inconsequential to the survival and recovery of the species. Nor does the Service identify where this permanent loss is projected to occur—e.g., whether it is in a particularly important part of the species' remaining range—or over what time frame.[9]

Despite conceding that "the Service did not explain in the final rule exactly why it equated the 'less than 2 percent' figure with 'low risk,'" JA-96, the district court found Service's 4(d) Rule adequate. The district court stated that it is "self-evident that [less than 2 percent] is a small figure" and that even if the beetle loses

---

[9] Also, as noted previously, beetle experts have opined that the Service, in the Status Assessment, misstated their views on the extent to which beetle habitat will be lost to agricultural conversion. *See supra* at n.1.

this habitat, it still will have millions of acres left to utilize. *Id*. This rationale, however, not only substitutes the court's reasoning for that of the agency, but turns a blind eye to the important fact that the beetle now occupies only 10% of its historic range. A further loss of habitat, along with the other grave threats facing the species, adversely impacts and, at the very least, impedes recovery of the species. In any event, at a minimum, the Service itself must reasonably articulate why the permanent loss of additional habitat in the Southern Plains is consistent with the "conservation" of the beetle. 16 U.S.C. § 1533(d). The Service has failed to do so.

In brief, because the Service has failed to set forth a reasonable explanation for protecting the beetle from incidental take in the Northern Plains while failing to do so in the Southern Plains, the 4(d) Rule is arbitrary and capricious as well as violative of the statutory definition of "conservation." *See Select Specialty Hosp. - Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (holding that where an agency's failure to "adopt an intelligible decisional standard is so glaring . . . we can declare with confidence that the agency action was arbitrary and capricious").

## CONCLUSION

For the foregoing reasons, the district court ruling should be reversed. The Service's downlisting decision should be vacated as contrary to the ESA and APA,

thus reinstating the beetle's listing as endangered. Should the court decline to

vacate the downlisting, the 4(d) Rule should be vacated insofar as it eliminates

protections for the beetle in the Southern Plains.

Dated: December 24, 2024          Respectfully submitted,

*/s/ Kristine M. Akland*
Kristine Akland (D.C. Cir. Bar No. 64933)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

*/s/Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar No. 358287)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St., N.W., Suite 1300
Washington, D.C.  20005
Tel: (202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

# ADDENDUM

# **TABLE OF CONTENTS**

**Administrative Procedure Act**

    5 U.S.C. § 706 ...................................................................................A2

**Endangered Species Act**

    16 U.S.C. § 1532 ...............................................................................A3

    16 U.S.C. § 1533 ...............................................................................A4

    16 U.S.C. § 1536 ...............................................................................A7

    16 U.S.C. § 1538 ...............................................................................A9

    16 U.S.C. § 1539 .............................................................................A10

    16 U.S.C. § 1540 .............................................................................A11

**Judiciary and Judicial Procedure**

    28 U.S.C. § 1291 .............................................................................A12

**Code of Federal Regulations**

    50 C.F.R. § 424.11 ..........................................................................A13

## Administrative Procedure Act

### 5 U.S.C. § 706 – Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

    **(1)**    compel agency action unlawfully withheld or unreasonably delayed; and

    **(2)**    hold unlawful and set aside agency action, findings, and conclusions found to be—

        **(A)**    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

## Endangered Species Act

**16 U.S.C. § 1532 – Definitions**

For the purposes of this chapter—

…

**(3)**    The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

**…**

**(6)**    The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

**…**

**(20)**    The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

A3

## Endangered Species Act

## 16 U.S.C. § 1533 – Determination of endangered species and threatened species

**(a)    GENERALLY**

**(1)**    The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:

**(A)**    the present or threatened destruction, modification, or curtailment of its habitat or range;

**(B)**    overutilization for commercial, recreational, scientific, or educational purposes;

**(C)**    disease or predation;

**(D)**    the inadequacy of existing regulatory mechanisms; or

**(E)**    other natural or manmade factors affecting its continued existence.

…

**(b)    BASIS FOR DETERMINATIONS**

**(1)**

**(A)**    The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction; or on the high seas.

…

**(c)   LISTS**

…

  **(2)   The Secretary shall—**

  **(A)   conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and**

  **(B)   determine on the basis of such review whether any such species should—**

  **(i)   be removed from such list;**

  **(ii)   be changed in status from an endangered species to a threatened species; or**

  **(iii)   be changed in status from a threatened species to an endangered species.**

…

**(d)   PROTECTIVE REGULATIONS**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

…

**(f)    RECOVERY PLANS**

**(1)**    The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable—

**(A)**    give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

**(B)**    incorporate in each plan—

**(i)**    a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

**(ii)**    objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

**(iii)**    estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

## Endangered Species Act

## 16 U.S.C. § 1536 – Interagency cooperation

**(a)     FEDERAL AGENCY ACTIONS AND CONSULTATIONS**

…

    **(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

…

**(b)     OPINION OF SECRETARY**

…

    **(4)** If after consultation under subsection (a)(2), the Secretary concludes that—

        **(A)** the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

        **(B)** the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

        **(C)** if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

A7

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

    **(i)**    specifies the impact of such incidental taking on the species,

    **(ii)**    specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

    **(iii)**    in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

    **(iv)**    sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

# Endangered Species Act

## 16 U.S.C. § 1538 – Prohibited acts

**(a)  GENERALLY**

**(1)**  Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

…

**(B)**  take any such species within the United States or the territorial sea of the United States;

## Endangered Species Act

### 16 U.S.C. § 1539 – Exceptions

**(a)   PERMITS**

**(1)**   The Secretary may permit, under such terms and conditions as he shall prescribe—

…

**(B)**   any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity.

**Endangered Species Act**

## 16 U.S.C. § 1540 – Penalties and enforcement

**(g)  CITIZEN SUITS**

**(1)**  Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

…

**(C)**  against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

**Judiciary and Judicial Procedure**

## 28 U.S.C. § 1291 – Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## Code of Federal Regulations

### 50 C.F.R. § 424.11– Factors for listing, delisting, or reclassifying species

…

(d)    In determining whether a species is a threatened species, the Services must analyze whether the species is likely to become an endangered species within the foreseeable future. The foreseeable future extends as far into the future as the Services can make reasonably reliable predictions about the threats to the species and the species' responses to those threats. The Services will describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability. The Services need not identify the foreseeable future in terms of a specific period of time.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,817 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Respectfully submitted this 24th day of December, 2024.

*/s/ Kristine M. Akland*
Kristine M. Akland

## CERTIFICATE OF SERVICE

The undersigned certifies that the Opening Brief of Plaintiff-Appellant the Center for Biological Diversity is being electronically filed with the Clerk of the Court for the United States Court of Appeals by utilizing the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 24th day of December, 2024.

*/s/ Kristine M. Akland*
Kristine M. Akland